James Wyman Smith was indicted for capital murder committed during a kidnapping in the first degree, Ala. Code 1975, §13A-5-40(a)(1).[1] The jury found Smith "guilty as charged in the indictment" and recommended that he be sentenced to death. The trial court, accepting the jury's recommendation, sentenced Smith to death. The Court of Criminal Appeals affirmed the judgment of the trial court, with an opinion, and we granted certiorari review. *Page 532 
On August 31, 1984, Linda Talbert was abducted from her place of employment — a convenience store in Smith's Station, a few miles northwest of Phenix City — and was subsequently strangled to death. Her body was discovered several days later. Despite great effort, law enforcement officials could not immediately determine definite suspects for the crime. On December 4, 1984, Smith burglarized an apartment in Auburn, and he was arrested on December 5, 1985, for the burglary. He pleaded guilty to that burglary and was sentenced to life imprisonment without parole. While Smith was in prison, a cellmate of his was Marion Enfinger, whose testimony both helped to secure an indictment against Smith for Talbert's murder and provided a substantial portion of the State's case against Smith.
At trial, during the State's case-in-chief, the prosecution called J.F., a resident of Columbus, Georgia, who testified that on the morning Talbert was abducted and killed, Smith came to J.F.'s office, where she worked alone, and forced his way into the office; that he had a pistol and that he made her take off her clothes; that "he got on top of [her]"; that he forced her to perform oral sex on him four or five times; that she took the gun away and tried to shoot him, but the gun malfunctioned and he took the gun back and tried to shoot her, but it again malfunctioned; and that Smith was "impotent" the entire time. Smith was indicted for this alleged assault, but he was never tried for it. J.F. is married to a detective; Enfinger testified that Smith had once told him that Smith had an incident with a policeman's wife in Columbus, Georgia. Before J.F. took the stand, Smith objected to her entire testimony as irrelevant and as being more prejudicial than it was probative of any material or relevant fact.
During closing argument at the guilt stage of the trial, the prosecutor made this statement:
 "Now, ladies and gentlemen, if this defendant ever gets loose again, he's going to do it again. He's going to kill, and he's going to kill again. And I would ask you to consider that, because, ladies and gentlemen, only you can stop him for sure."
Smith did not object to that argument.
Smith argues numerous grounds of error, but we address only two of the grounds to resolve this case: (1) whether the prosecutor's argument set out above was reversible error; and (2) whether the admission of J.F.'s testimony was reversible error. By not addressing the other grounds of error, we do not mean to imply that we necessarily agree with the rulings of the Court of Criminal Appeals regarding them.
Smith did not object to the prosecutor's guilt-phase closing argument that he now claims is reversible error. Nevertheless, because this is a death penalty case, we are directed by Rule 39(k), A.R.App.P., to "notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." "Plain error" exists when the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings, Ex parte Womack,435 So.2d 766 (Ala. 1983); see United States v. Frady,456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), and United Statesv. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981); in other words, "plain error" exists when a substantial right of the defendant has or probably has been adversely affected. Ex parte Johnson,507 So.2d 1351, 1356 (Ala. 1986); Tell v. State, 285 Ala. 234,231 So.2d 107 (1970).
The State acknowledges that the challenged portion of the prosecutor's closing argument at the guilt phase is error; as the State said at the oral argument of this case, "it's not proper to argue that you should convict somebody because he's going to kill again." The State argues that the error is not sufficiently prejudicial to be plain error, however, because, the State says, the prosecutor is entitled to make a *Page 533 
general appeal to the jury for the need for law enforcement as a deterrent to crime.
Unquestionably, we have consistently held that as long as a prosecutor does not comment on the possibility that the defendant will commit future illegal acts, he may legitimately argue to the jury the need for law enforcement as a deterrent to crime. Berard v. State, 486 So.2d 476, 479 (Ala. 1985); Exparte Waldrop, 459 So.2d 959, 962 (Ala. 1984); Cook v. State,369 So.2d 1251, 1255 (Ala. 1978). However, we have never indicated that a prosecutor may properly argue for the purpose of proving guilt that a defendant will commit future illegal acts.
In Cook, Recardo Cook was convicted of committing a murder during the robbery of a store. He was sentenced to death. Cook argued that his conviction should be set aside because, in closing, the prosecutor had argued that both storeowners and criminals were watching the case, the criminals wondering if the jury was "going to say to them, . . . 'we're going to give you a license to kill.' " Cook, at 1254. The Court noted that "a district attorney in closing argument may make a general appeal for law enforcement," id., and that "since the argument complained of did not imply that Cook himself would commit other illegal acts in the future the comment did not overstep the bounds of legitimate argument." Cook, at 1255.
In Ex parte Waldrop, another death penalty case, Waldrop argued that the prosecutor's argument at the sentencing hearing was reversible error because he told the jurors it was up to them whether to allow killers to live in society and that society had the right to defend itself against killers.Waldrop, at 961-62. The Court stated:
 "As in Cook, the closing argument in the instant case did not imply that the defendant himself would commit illegal acts in the future, nor did the prosecutor seek by inflammatory appeal to arouse in the jurors a personal hostility towards, or fear of, the defendant. Accordingly, the prosecutor's comments properly argued the necessity of law enforcement as a deterrent to crime and as a protection of society."
459 So.2d at 962.
In Berard v. State, Jerome Berard had been convicted of capital murder and after a second conviction and appeal, both he and the State petitioned this Court for certiorari review.486 So.2d at 477. At trial Berard had pleaded not guilty by reason of insanity. The prosecutor, on cross-examination of the defense's psychologist, asked if Berard could have another bout of insanity and "Is he capable of shooting somebody else?"486 So.2d at 478.
The Court noted that it is more prejudicial to a defendant to allow this kind of testimony than it is even to make such an argument in closing and held, as in Waldrop and Cook, that "as long as a prosecutor does not comment on the possibility that the defendant will commit future illegal acts, he may legitimately argue to the jury the need for law enforcement as a deterrence to crime." 486 So.2d at 479. The Court reversed Berard's conviction and stated the following as one of the reasons:
 "[T]he central issue in the guilt phase of a capital murder trial is whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of the crime charged. Beck [v. State], 396 So.2d [645] at 662 [(Ala. 1980)]. This kind of question could have easily shifted the focus of the jury's attention to the issue of punishment, which is an improper consideration at the guilt phase of the trial."
486 So.2d at 479.
Consider again the statement the prosecutor made in the closing argument at the guilt phase of Smith's trial:
 "Now, ladies and gentlemen, if this defendant ever gets loose again, he's going to do it again. He's going to kill, and he's going to kill again. And I would ask you to consider that, because, ladies and gentlemen, only you can stop him for sure."
This statement exemplifies the kind of statement proscribed by Cook, Waldrop, and Berard. The prosecutor directly stated *Page 534 
that Smith would kill again in the future "if [he] ever gets loose" and that "only you [the jury] can stop him for sure." The statement sought "by inflammatory appeal to arouse in the jurors a personal hostility towards, or fear of, the defendant." Waldrop, at 962. Like the testimony elicited inBerard, this closing argument at the guilt phase could have shifted the focus of the jury's attention from the central question of whether the State had proved its case beyond a reasonable doubt and to the issue of punishment, which is an improper consideration at the guilt phase of the trial. Berard, at 479; see also, State v. Barksdale, 590 S.W.2d 931 (Tenn. 1979). Accordingly, we hold both that the error involved in the prosecutor's argument would seriously affect the fairness and integrity of the proceedings and that substantial rights of Smith have been adversely affected. Berard; Waldrop; Cook; see also Johnson; Womack; Tell. Pursuant to the wording of either standard for determining plain error previously described, the prosecutor's argument was plain error, for which the judgment is due to be reversed and the cause remanded.[2]
Although we reverse for the reasons above, for the sake of judicial economy we address the propriety of J.F.'s testimony, because this issue is almost certain to recur on the remand for new trial.
J.F.'s testimony was evidence of a collateral or corollary crime. See, e.g., Johnson, supra. On numerous occasions, Alabama courts have addressed the admission of such testimony in relation to the general exclusionary rule. In Ex parteArthur, 472 So.2d 665 (Ala. 1985), a death penalty case, this Court stated:
 "In C. Gamble, McElroy's Alabama Evidence § 69.01(1) (3d ed. 1977), the general exclusionary rule is discussed as follows:
 " 'On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. . . .
 " 'This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of jurors.' (Footnotes omitted.)
 "Thus, the purpose of the rule is to protect the defendant's right to a fair trial by preventing convictions based on the jury's belief that the defendant is a 'bad' person or one prone to commit criminal acts. See Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983)."
472 So.2d at 668.
In Ex parte Cofer, 440 So.2d 1121, 1124 (Ala. 1983), the Court further stated:
 "The State has no absolute right to use evidence of prior acts to prove the elements of an offense or to buttress inferences created by other evidence. Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue." *Page 535 
In Robinson v. State, 528 So.2d 343 (Ala.Cr.App. 1988), the Court of Criminal Appeals explained that even if the proffered evidence fits within an exception to the general exclusionary rule, its probative value must outweigh its prejudicial effect for the evidence to be admissible:
 "However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. ' "Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects." ' Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App. 1985), quoting, United States v. Turquitt, [557 F.2d 464, 468-69 (5th Cir. 1977)]. ' " 'Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, 'prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.' " ' Averette v. State, supra, at 1374."
528 So.2d at 347. (Emphasis added.)
The Court of Criminal Appeals held that J.F.'s testimony was admissible under both the res gestae exception and the motive exception to the general exclusionary rule. That court said that J.F.'s testimony had probative value in relation to the res gestae because her testimony indicated a series of related sexual assaults by Smith on the day Talbert was abducted, that is, that J.F.'s testimony indicated that Smith had sexually assaulted J.F. an hour before the abduction of Talbert and that the assault on Talbert could be taken as a sexual assault because she was found nude.
The Court of Criminal Appeals also said that J.F.'s testimony had probative value to show motive. In closing, the prosecutor took J.F.'s testimony that Smith was "impotent" during the entire assault and argued that because Smith was frustrated and obsessed with that "impotence," he abducted Talbert, tried to rape her, and then killed her when he was unsuccessful. Marion Enfinger, one of Smith's cellmates called by the prosecution, testified to the effect that Smith told him that he had attempted to rape a woman, but "could not," so he strangled her. Based on the use of the evidence to prove res gestae and motive, the Court of Criminal Appeals held that the probative value of the evidence outweighed its prejudicial effect.
We disagree. The undue and unfair prejudice caused by J.F.'s testimony is almost self-evident: to defend against J.F.'s testimony, the defense, in the middle of a capital murder trial, would have had to conduct a full-blown trial and defense of the alleged sexual assault. J.F. did not summarily testify that Smith had sexually assaulted her (even summary testimony might have been inadmissible); her testimony alone might well have allowed a jury to convict Smith for a sexual abuse crime.
Although we do not determine whether the Court of Criminal Appeals erred by holding that the evidence was relevant to prove the res gestae, we are less convinced than the Court of Criminal Appeals of the probative value of the evidence to prove the res gestae. J.F.'s testimony indicated that the assailant had a pistol; J.F. was not kidnapped or murdered. Unlike J.F.'s situation, Talbert was both kidnapped and murdered; also, Talbert was strangled, not shot. No doubt, as in J.F.'s case, there were sexual overtones in Talbert's case: Talbert was found nude and Enfinger testified that Smith said he had tried to rape a woman but could not, so he strangled her. *Page 536 
Finally — and this fact is persuasive in regard to the prejudicial effect of J.F.'s testimony outweighing its probative value — at the hearing on the motion for a new trial, Detective Jennifer Rowe of the Columbus, Georgia, police department testified concerning a statement made by J.F. in the police interview immediately after the sexual assault:
 "Q. That was the question as to whether or not [J.F.] told you that the suspect in this case reached a climax, or orgasm, as a result of the sexual act?
"A. She stated to me that he did."
Accordingly, there was evidence that in the version of the assault that J.F. gave to the police, she totally contradicted her later trial testimony on the very point that the Court of Criminal Appeals held would allow the testimony to be admissible pursuant to the motive exception to the general exclusionary rule. Considering the undue and unfair prejudice that J.F.'s testimony created, compared to its dubious probative value, we hold that J.F.'s testimony in its entirety is inadmissible, because its prejudicial effect outweighs its probative value. Arthur; Cofer; Robinson. Accordingly, the admission of the testimony was error.
The judgment of the Court of Criminal Appeals is due to be reversed and the cause remanded to that court with directions to order a new trial.
REVERSED AND REMANDED WITH DIRECTIONS.
HORNSBY, C.J., and ALMON, HOUSTON and INGRAM, JJ., concur.
MADDOX, SHORES and STEAGALL, JJ., concur in the result.
[1] The indictment stated:
 "The Grand Jury of said County charge that before the finding of this Indictment James Wyman Smith, alias James Smith, whose true Christian name is otherwise unknown to the Grand Jury, did intentionally cause the death of Linda Darlene Talbert by strangling her with an article of clothing, and James Wyman Smith cause[d] said death during James Wyman Smith's abduction of, or attempt to abduct, Linda Darlene Talbert with intent to inflict physical injury upon her or to violate her sexually, in violation of § 13A-5-40(a)(1) of the Code of Alabama."
[2] Although we do not make this a basis for our holding, we question the propriety of arguing that Smith will "kill, and . . . kill again," inasmuch as Smith is already serving asentence of life without parole. He was serving that sentence at the time of the trial. We further question the propriety of an argument that Smith would "kill and kill again," when there is no evidence to that effect and the prosecutor is merely giving his personal psychiatric analysis. Of course, evidence that Smith will at some future time "kill and kill again" is likely to be irrelevant at the guilt phase of the trial.