The appellant, Melvin Davis, was charged in a five-count indictment with the capital murders of John Bradley and Timothy Ray, with the attempted murder of Eugene Smith, and with the conspiracy to commit the murder of Charlie Boswell, Jr. Count I of the indictment charged the appellant with the capital offense of the murder of two or more persons. § 13A-5-40(a)(10), Ala. Code 1975. Count II of the indictment charged the appellant with the capital offense of the murder of John Bradley committed during the course of a burglary. § 13A-5-40(a)(4), Ala. Code 1975. Count III of the indictment charged the appellant with the capital offense of the murder of Timothy Ray committed during the course of a burglary. § 13A-5-40(a)(4), Ala. Code 1975. Count IV of the indictment charged the appellant with the attempted murder of Eugene Smith, § 13A-4-2, Ala. Code 1975, and § 13A-6-2, Ala. Code 1975. Count V of the indictment charged the appellant with conspiracy to commit murder as to Charlie Boswell, Jr. § 13A-4-3, Ala. Code 1975. The jury found the appellant guilty on all counts of the indictment and returned an advisory verdict recommending the death penalty, by a vote of 10-2. A separate sentencing hearing was held before the trial court, after which the appellant was sentenced to death by electrocution for each of the *Page 1155 
three capital offenses and to 99 years' imprisonment for the attempted-murder conviction and for the conspiracy-to-commit-murder conviction.
The trial court made the following findings of fact concerning the offenses:
 "Timothy Ray was twenty-seven years old at the time of his death. He was shot seven times, execution style, at point-blank range. John Bradley was sixty-seven years old at the time of his death and was shot three times, execution style, at point-blank range. Eugene Smith was fifty years old when he was shot execution style in the head. Miraculously, he survived and testified at trial. Charlie Boswell, Jr., was the target of the murders as he was the informant in a drug case that was pending against Davis and his brother, Princeton Davis. Boswell, Jr., was not at the home when the shootings occurred. The roots of this case stem from an earlier drug sale case against Davis. In 1995 and 1996, Davis sold marijuana, along with his brother Princeton Davis, from his family's apartment in Gibbs Village. The Montgomery Police Department learned of these drug sales and sent an informant, Charlie Boswell, Jr., to make controlled buys. Boswell made several buys from Princeton Davis and one buy from Davis. Based upon these buys, Davis and his brother were arrested and charged with distribution of marijuana. They were subsequently indicted on the offenses. The drug case involving Melvin Davis is case CC-96-1183; the case involving Princeton Davis is CC-96-1304/05/06.
 "During the pendency of this case, Davis learned of the identity of the informant, Boswell, from his lawyer. Davis determined that the way to eliminate the case was to eliminate the informant. Approximately three weeks before the murders, Davis met with Marcus Dunn and codefendants, Derrick Singleton and Antonio Jointer, at the house on Caffey Dr., where Davis had moved his drug operation. At this meeting Davis discussed several ways in which to silence the informant. It was decided that Boswell, Jr., would be killed. Boswell, Jr., lived, at times, with his father at 3325 Loveless Curve, which was around the corner from where Davis was selling drugs. Singleton scouted the house and on one occasion drove by it with Dunn to show him where the informant lived.
 "On Thanksgiving night, November 29, 1996, Davis met with Singleton and Jointer to go to the Top Flight Disco. The three drove to the club in Singleton's Chevrolet Nova. They stayed in the club until closing, which was approximately 2:00 a.m. They then left the club in the same automobile, with Davis driving, Jointer in the front passenger seat, and Singleton in the rear passenger seat. They traveled down High St. to Decatur St. and then turned right on Fairview Ave. Jointer believed that they were taking him to his home which was on Rosa Parks Ave. Instead, at the traffic light at Fairview and Interstate 65, Davis produced a .45 caliber pistol and Singleton produced a .38 caliber pistol, stating, `It's time.' Jointer knew that they meant it was time to kill the informant. Jointer was unarmed. Davis then drove to Caffey Dr. and then turned onto Loveless Curve, stopping down the street from the house. They then approached the house. Davis banged on the door at 3325 Loveless Curve until the home owner, Charlie Boswell, Sr., came to it. Davis then stated that he was there to see `Lewis.' Boswell replied that Lewis did not live there but, inquired if he meant `Eugene,' who was Eugene Smith, Mr. Boswell's *Page 1156 
close friend and roommate. Davis stated that he did, and Mr. Boswell let all three men inside the house. Present in the house with Mr. Boswell were Timothy Ray, who was asleep on a love seat by the front door in the living room, John Bradley, who was asleep on a couch in the living room, and Eugene Smith, who was in the bedroom at the back of the house. Davis and Singleton went to the door of Mr. Smith's bedroom and Davis asked, `Is that him?'[1] Singleton replied in the affirmative. At trial, Mr. Smith positively identified Davis as one of the men standing at his door. At that point, as Mr. Smith described it, the other one walked to him, placed the gun to his ear and fired. Miraculously, he survived but was seriously wounded. Jointer, who was standing in the hallway, heard the shot and was numb with fear. Davis, Singleton, and Jointer then fled the house. As they were leaving, Davis and Singleton coldly and methodically pumped numerous rounds into Timothy Ray and John Bradley. Mr. Ray was shot seven times at point-blank range with a .45 caliber pistol and a .38 caliber pistol while Mr. Bradley was shot three times at point-blank range with .45 caliber and .38 caliber pistols. .45 caliber shell casings were found in Eugene Smith's bedroom and in the living room near the bodies of Mr. Smith and Mr. Ray. .38 caliber and .45 caliber slugs were also found in the house and were recovered from the bodies of the victims. Timothy Ray and John Bradley were shot for no reason except they were in the path of the defendants as they fled. Davis told Jointer that if he ever told anyone about the shootings, he would kill him.
 "After the shootings, Davis drove to the Waffle House [restaurant] on West South Blvd. with Singleton and Jointer where they met Davis's girlfriend, Kaneshia Taylor. Davis and Singleton sat with Taylor and ordered food while Jointer sat by himself at another booth.
 "For approximately one year this case went unsolved until Dunn, who was facing drug charges, came forward with the information concerning the conspiracy to kill Charlie Boswell, Jr., initiated by, and to the benefit of, Davis. This statement led the police to Jointer who gave a statement implicating Davis and Singleton in the shootings. Davis, upon being questioned by police, denied any involvement in the shootings but admitted to being with Jointer and Singleton that night."
 I.
The appellant argues that the trial court erred in admitting into evidence crime-scene photographs and autopsy photographs of the victims because, he says, the prejudicial effect of the photographs outweighed their probative value. In support of his argument, he contends that the photographs were unnecessary because, at trial, he, through defense counsel, offered to stipulate to the following facts: the number of people killed, the names of the victims, the causes of death, and the location of the shootings.
The record indicates that during the trial, when the State attempted to admit into evidence the photographs of the two deceased victims, defense counsel made the following objection:
 "[Defense Counsel]: Judge, as the record will indicate, earlier I made a general objection to the production of *Page 1157 
such things as autopsy photos. And Your Honor invited me to renew those objections at the time they were offered. I am doing so now. My objection is based on two grounds. Number one, the pictures which presumably are being offered for identification are pictures that are unnecessarily gruesome by their very nature and really are not being offered for identification. I specifically refer to picture number 10. This hardly would be, in my opinion and upon my argument, that hardly would be the picture I would show someone to see if they knew what they looked like. Moreover, Your Honor, we would be perfectly willing to stipulate that these two men are the victims, that they were shot, that they were shot however many times the evidence says they were shot, that they were shot with whatever bullet was pulled from their body, [and that] the cause of the death was the shooting. We are not contesting a single question about the crime scene. So their relevance, Your Honor, which relevance requires admissibility on the grounds that the offered information tends to prove a material fact. There is no material fact that's proved that we are not willing to stipulate to. So, therefore, their effect, in addition to being more prejudicial than probative, is cumulative. And, moreover, on the second argument of relevance, unless it tends to connect in this case this defendant to this crime, it is irrelevant. They may as well be showing the first 20 minutes of [Saving] Private Ryan,[2] because we are not saying this didn't happen, and it didn't happen the way [the prosecutor] described it."
The record indicates that the trial court overruled defense counsel's objection and allowed the State to present 20 photographs of the deceased victims. The photographs consisted of identification photographs of the victims and photographs displaying some, but not all, of the gunshot wounds they suffered. Some photographs displayed only shell casings lying on the floor of the house.
The ultimate question in determining the admissibility of photographs of victims, as with all demonstrative evidence, is:
 "Whether it has a reasonable tendency to prove or disprove some material fact in issue. This decision is left largely to the sound discretion of the trial judge. Of course, the decision of the trial judge is not necessarily final since his decision is reviewable to determine if there has been an abuse of discretion."
C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (5th. ed. 1996) (footnotes omitted).
 "In Johnson v. State, 620 So.2d 679, 692 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), the appellant argued that grossly inflammatory photographs should not have been allowed into evidence at the guilt and penalty stages of the trial. In holding that the photographs were admissible at both stages, this court stated:
 "`We have reviewed the challenged photographs and, although they are not pleasant to look at, we conclude that the trial court did not err in admitting them at either stage of the proceedings. *Page 1158 
 "`"[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters." Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). "[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert at 784. See also Ex parte Bankhead. We find no error in the trial court's admission of the photographs at the guilt phase of the trial. See, e.g., Smith v. State, 581 So.2d 497 (Ala.Crim.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala. 1991) (photographs of victim's decomposed and bloated body properly admitted); Dabbs v. State, 518 So.2d 825
(Ala.Crim.App. 1987) (photographs of victim's head injuries taken during autopsy were gruesome but necessary to demonstrate extent of injuries); Hamilton v. State, 492 So.2d 331 (Ala.Crim.App. 1986) (photograph of deceased's exposed scalp properly admitted into evidence.)'"
Boyd v. State, 715 So.2d 825, 833 (Ala.Crim.App. 1997). See also Georgev. State, 717 So.2d 827 (Ala.Crim.App. 1996); Arthur v. State,711 So.2d 1031 (Ala.Crim.App. 1996); Siler v. State, 705 So.2d 552
(Ala.Crim.App. 1997).
Here, although the appellant argues that he "would have" stipulated to the facts underlying the photographs, and that so stipulating, he argues, would have eliminated any necessity for the introducing the photographs, there is no indication from the record that such a stipulation between the State and defense counsel occurred. Additionally, because the photographs were relevant to show not only the location and details of the offense, but also the extent of the victims' injuries as well as the heinous manner in which those injuries were inflicted, they were properly admitted into evidence. Moreover, the photographs were illustrative of the testimony of a number of witnesses. Thus, the trial court did not abuse its discretion in admitting the photographs into evidence.
 II.
The appellant argues that the jury improperly convicted him of two counts of murder committed during a burglary because, he says, the State did not prove the elements of a burglary. At the close of the State's case, the appellant moved to dismiss the two counts of murder committed during a burglary because the State failed to prove a "breaking and entering."
The appellant, for the first time during oral argument before this Court, argued that the State failed to prove that he "remained unlawfully" in the dwelling, after he and his accomplices had been allowed to enter the home by Charlie Boswell, Sr. Additionally, he argued that the trial court improperly instructed the jury on burglary-murder because, he says, the jury was not given specific instructions relating to entry by trick or deception. Because the appellant failed to object on these grounds before the trial court, this issue must be analyzed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P., and the appellant's failure to object weighs against any finding of prejudice. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991).
Alabama's first-degree burglary statute, § 13A-7-5, Ala. Code 1975, provides:
 "(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains *Page 1159 
unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime:
 "(1) Is armed with explosives or a deadly weapon; or
 "(2) Causes physical injury to any person who is not a participant in the crime; or
 "(3) Uses or threatens the immediate use of a dangerous instrument."
The Commentary to § 13A-7-1, Ala. Code 1975, states:
 "Alabama's burglary statute further provides that `[a] person "enters or remains unlawfully" in or upon premises when he is not licensed, invited or privileged to do so.' Ala. Code 1975, § 13A-7-1(4). An unlawful entry or unlawful remaining constitutes the trespassory element of burglary, which element, when coupled with the intent to commit a crime inside, forms the nucleus of the burglary offense. `A person who is licensed or privileged to enter premises cannot, therefore, commit criminal trespass or burglary under the proposal. Of course, a person who gains admittance through intimidation, deception, trick or artifice does not enter with `license or privilege.'"
A reading of Alabama's burglary statute reveals that it contains two elements in subsection (a) that are stated in the alternative. These elements are: that the defendant either knowingly and unlawfully entered or remained unlawfully in a dwelling with the intent to commit a crime therein. "Under the current burglary statute, the State is no longer required to prove a `breaking and entering'; that common law element has been replaced with the general requirement that there be an unlawful entry or unlawful remaining." Freeman v. State, 776 So.2d 160
(Ala.Crim.App. 1999.)
Although the State argues that the appellant and his accomplices entered and remained unlawfully in the residence of Charlie Boswell, Sr., we need not address the "remaining unlawfully" element of the burglary statute because it is designed to encompass those cases where a person enters pursuant to a license or a privilege but remains after that license or privilege is terminated. Here, the record is clear that the appellant gained admittance into the residence by deception. As reiterated in the trial court's findings of fact, the State presented evidence that the appellant conspired to kill Boswell, Jr., to prevent him from testifying at the appellant's drug trial. The appellant met with Marcus Dunn and accomplices, Derrick Singleton and Antonio Jointer, to discuss his plan. Dunn testified that the appellant told them that he would do "whatever it took to stop [Boswell, Jr.] from coming to court on his brother." Jointer testified that the appellant first said that "he wanted to go over there and just tie him up, and then he came back and said he wanted to go over there and tie him up and kill him." Singleton testified that he scouted the residence at 3325 Loveless Curve where Charlie Boswell, Jr., sometimes stayed with his father, Charlie Boswell, Sr. He further indicated that on one occasion, prior to the "hit," he drove by the house to show Marcus Dunn where it was; Dunn originally was going to be a participant in the murder. Additionally, the State's evidence showed that during the early morning hours of November 29, 1996, the appellant, along with Antonio Jointer and Derrick Singleton, left a Montgomery nightclub in Singleton's car.
Jointer testified that he thought that the appellant was taking him home until he produced a .45 caliber pistol and stated, *Page 1160 
"It's time." Jointer testified that he knew that the appellant meant by that statement that it was time to carry out his plan to kill Boswell, Jr. Evidence was presented that the appellant parked two or three houses down from the residence to avoid detection. While Singleton held a gun to Jointer's back, the threesome walked to the front of the house. The appellant then knocked on the front door. After several minutes, the owner of the house, Charlie Boswell, Sr., who had a gun in his hand, answered the door. Evidence was presented that the appellant asked to see "Louis," to which Boswell responded that a "Louis" did not live there, but that Eugene, Bradley, and Timothy were there.[3] Evidence was presented that the appellant then asked to see Eugene in order to gain entry into the house. Boswell, Sr., let them inside because he thought that they knew Eugene. Evidence was presented that the appellant and Singleton first looked at the faces of the victims, John Bradley and Timothy Ray, who were asleep in the living room, and then walked toward Eugene Smith's bedroom, located in the back of the house. Evidence was presented that Singleton asked the appellant if Eugene Smith was "one of them." Smith testified that he looked at the appellant, whom he had never met before, and asked him, "One of who?" After the appellant nodded affirmatively, Singleton placed his .45 caliber pistol in Smith's ear and fired.
Smith survived the shot and identified the appellant as the man who ordered Singleton to shoot him. After hearing the single shot from Smith's room, Charlie Boswell, Sr., attempted to load his gun. While he was loading his gun, he heard several more gunshots coming from the living room. By the time he had loaded his gun and was in the living room, the appellant and his accomplices were gone. He found Eugene Smith, calling out in pain with a severe head injury, and John Bradley and Timothy Ray, who were both dead. He testified that Bradley and Ray had never moved from their sleeping positions.
The State's evidence established that the appellant and his accomplices did not have a license or privilege to enter the residence based upon their unlawful entry by trick or deception with the intent to commit a crime therein. The appellant pretended to know Eugene in order to gain entry, when he became aware that asking for a "Louis" would not get him into the house. The jury could have reasonably inferred from the evidence that the appellant, in carrying out his plan, had a premeditated intent to kill Charlie Boswell, Jr., and knew that he had to lie to Boswell, Sr., to gain admittance into the residence. The time selected for the commission of the crime, and the efforts used by the appellant to discreetly come and go from the scene, in addition to the possession of deadly weapons, supported the conclusion that the appellant and his accomplices intended to unlawfully enter the residence by deception and to commit a crime therein.
Additionally, the appellant's argument that the trial court erred in refusing to give a more specific instruction on unlawful entry by trick or artifice is without merit. As stated earlier, the appellant failed to raise such an objection before the trial court; instead, he waited until oral argument before this Court to present it. Thus, it must be analyzed under the plain-error standard. Rule 45A, Ala.R.App.P. Before giving its jury instructions, the trial court informed both the State and defense counsel that its "inclination [was] simply *Page 1161 
[to] give the pattern instructions." The trial court then instructed the jury, in pertinent part:
 "The law states that an intentional murder committed during a burglary in the first degree is capital murder. A person commits an intentional murder if he causes the death of another person and in performing the act or acts which caused the death of another person, he intends to kill that person or some other person. A person commits a burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling, and he does so with the intent to commit a crime therein, and while effecting entry or while in the dwelling or in the immediate flight therefrom he or another participant in the crime is armed with a deadly weapon. Therefore, in order to convict, the State must prove the following elements beyond a reasonable doubt: Number one that Mr. Bradley is dead. Number two, that the defendant, Mr. Davis, caused the death of Mr. Bradley by, in this case, shooting him. Number three, that in committing the act or acts which caused the death of the victim in this case, the defendant intended to kill the deceased or some other person. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and must be specific. The defendant knowingly and unlawfully entered or remained unlawfully in the dwelling of Mr. Boswell, and that in doing so, the defendant acted with the intent to commit the crime, which in this case was murder. And that while in the dwelling or in effecting entry thereto or in the immediate flight therefrom, the defendant or some other participant was armed with a deadly weapon. And, finally, that the murder actually took place during the burglary.
 "A person acts intentionally with respect to a result or to a conduct when it is his or her purpose to cause that result or to engage in that conduct.
 "A dwelling is a building which is normally used by a person for sleeping, living, or lodging therein.
 "A person acts knowingly if he is aware of the facts that he has no license or privilege to enter or remain in a dwelling.
 "And a person enters or remains unlawfully in or upon a premise when he is not licensed, invited, or privileged to do so."
In reviewing the appellant's argument, we are mindful of the Alabama Supreme Court's holding in Ex parte Wood, 715 So.2d 819, 824 (Ala. 1998), wherein that Court stated:
 "While most pattern jury instructions may be properly used in the majority of criminal and civil cases, there may be some instances when using those pattern charges would be misleading or erroneous. In those situations, trial courts should deviate from the pattern instructions and give a jury charge that correctly reflects the law to be applied to the circumstances of the case. Similarly, while there will likely be few instances in which the giving of a pattern instruction would be plainly erroneous in a capital case, we do not foreclose that possibility. For that reason, a trial court must diligently scrutinize the jury charges it gives — even pattern charges — on a case-by-case basis to ensure that they properly instruct the jury in accordance with applicable statutes and caselaw."
The trial court's instructions in this case are in the Alabama PatternJury Instructions. Additionally, the instructions track the language of the burglary statute. See *Page 1162 
§ 13A-7-1, Ala. Code 1975. Moreover, the trial court's instruction contained all of the essential elements of the offense and, considered as a whole, allowed the jury to reach an informed verdict. See Roberts v.State, 735 So.2d 1244, 1252 (Ala.Crim.App. 1997) ("A trial court has broad discretion in formulating its jury charge, so long as the instructions accurately reflect the law and relevant facts. When reviewing a claim of error in a jury instruction, the jury charge must be construed as a whole and the language must be construed reasonably."). The trial court informed the jury of the pertinent parts of the burglary statute and explained the operative words of the statute in the context of this case, thereby allowing the jury to make an informed decision. Based upon the facts of this case, it was unnecessary for the trial court to instruct the jury that an "unlawful entry" is effectuated when entry is gained through intimidation, deception, trick, or artifice. Such terms are commonly used to describe an unlawful entry and, therefore, their meaning is clear. In Roberts v. State, 735 So.2d 1244, 1252
(Ala.Crim.App. 1997), this Court held:
 "`Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.' Boyde v. California, 494 U.S. 370, 380-81, 110 S.Ct. 1190, 108 L.Ed.2d 316
(1990)."
Because the trial court's instruction to the jury left no doubt as to the circumstances under which the jury could, using common sense, find the crimes could have been committed, there was no plain error in this regard.
 III.
The appellant argues that the trial court erred by improperly commenting "on the weight and effect of the evidence or on the credibility of a witness," just before the presentation of the defense's case. More particularly, he argues that the trial court erred when it read into evidence a stipulation entered into by both parties that related a sequence of events pertaining to Eugene Smith, the State's witness who testified concerning his having been shot in the head by the appellant's codefendant. In support of his argument, the appellant contends that the use of the word "emphatically" in the stipulation was prejudicial because, he says, it was a tacit endorsement by the trial court of the witness's testimony.
The appellant failed to object on this ground at trial, and, therefore, the argument raised herein is subject to plain-error review. Rule 45A, Ala.R.App.P. Consequently, the failure to object at trial weighs against any claim of prejudice. Kuenzel v. State, supra.
The record indicates that the comments read by the trial court were not its comments, but those of the State and defense counsel, both of whom agreed to the stipulation. Additionally, the record indicates that not only did defense counsel agree to the facts and the wording contained in the stipulation, but also requested that the stipulation, which appears to be favorable to the appellant, be read during the presentation of its case. The stipulation was entered as follows:
 "THE COURT: . . . I have one stipulation I am going to read to you [the jury]. And, again, this is a stipulation much like yesterday when there was a stipulation as to the qualifications and expertise of a couple of witnesses. This stipulation *Page 1163 
is a fact that occurred, and you can consider this fact along with the rest of the evidence presented in this case.
 "On August 23, 1998, Eugene Smith met with [Investigator] Randy McNeill to discuss trial testimony. Present at the meeting was his sister, Mary Glover. Mr. McNeill knew that he had not previously been shown a lineup of the defendants, including the defendant, Melvin Davis. So, therefore, Mr. McNeill asked him if he thought he could identify the man who shot him if he was shown a lineup. He stated he could.
 "Mr. McNeill then produced a photo lineup containing the defendant's picture, which had been introduced as evidence, and I believe it is marked as Defendant's Exhibit 4. Mr. McNeill did not prompt him to suggest to him the identity of the defendant. Mr. Smith studied the lineup for less than ten seconds and then emphatically stated that Number Four, who was, in fact, Mr. Davis, was the person that stood at the door and was the man who shot him. Mr. McNeill then asked him if he was certain, in which he stated that this was the defendant. And Mr. Smith reiterated that the defendant did not shoot him but was present when he was shot.
 "Approximately 15 minutes later, Mr. Smith was again shown the lineup by Investigator Tibbs of the District Attorney's office and was asked if he could identify the person who shot him. Mr. Smith seemed confused and acted as if he had not previously been shown the lineup and stated that he recognized Number Six and Number Two who were in the photo lineup.
 "Mr. McNeill did not question him any further because he seemed confused.
 "Now, we are ready for the defense to call any additional witnesses they want to call."
Because the underlying basis for this argument concerns a stipulation of the parties that was read into evidence by the trial court, and because it does not contain an improper comment on the evidence by the trial court, the appellant's argument lacks merit. "`An invited error is waived unless it rises to the level of plain error.' Ex parte Bankhead,585 So.2d 112, 126 (Ala. 1991)" Perkins v. State, [Ms. CR-93-1931, Nov. 19, 1999] ___ So.2d ___, ___ (Ala.Crim.App. 2000). No plain error occurred in this regard.
 IV.
This Court is required by § 13A-5-53, Ala. Code 1975, to review the propriety of the appellant's sentence of death and to examine the record in this case for plain error. Rule 45A, Ala.R.App.P.
We have reviewed the trial court's findings concerning the aggravating circumstances and the mitigating circumstances in this case. The trial court found the following aggravating circumstances: that the capital offense occurred while the appellant was engaged, or was an accomplice, in the commission of, or an attempt to commit, a burglary; that the capital offenses was committed while the appellant was under a sentence of imprisonment (the appellant was on parole for another offense when he committed the charged crime); and that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. As for mitigating circumstances, the trial court found that the appellant's life has value and that the appellant is loved by his family.
In weighing the aggravating circumstances against the mitigating circumstances, *Page 1164 
the trial court stated the following:
 "This Court cannot erase from its mind the callousness and the utter disregard for life Davis exhibited in committing this crime. He planned to kill an informant to have the cases of he [sic] and his brother dismissed. Consequently, Eugene Smith was shot execution style under the mistaken impression that he was the informant. Timothy Ray and John Bradley were executed because they were in the pathway of escape. A colder more callous crime is hard to imagine. Davis took pleasure in taking another person's life. Almost as disturbing is that Davis was on probation when he committed the offense. He had been given numerous opportunities to conform his conduct to the norms of society, but he steadfastly refused to conform. Davis took the opportunity to change and better himself that had been given him by the criminal justice system and chose not to take advantage of the opportunity but instead to take advantage of the criminal justice system. He continued to sell drugs and when caught he attempted to cheat the system and in so doing cheated two innocent men of their lives."
Our review of the record indicates that the trial court's findings are supported by the record. We find no evidence that the appellant's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating circumstances and the mitigating circumstances convinces us that death is the appropriate and proper sentence in this case.
Furthermore, the appellant's sentence of death is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. See, e.g., Ex parte Maples, 758 So.2d 81 (Ala. 1999) (murder made capital because two or more persons were murdered pursuant to one scheme or course of conduct); Neal v. State, 731 So.2d 609 (Ala.Cr.App. 1997), aff'd, 731 So.2d 621 (Ala. 1999) (murder made capital because it occurred during a burglary in the first degree); Ex parte Freeman,766 So.2d 203 (Ala. 2000) (among other convictions, murder of two or more persons during one scheme or course of conduct and murder during a burglary in the first degree).
Pursuant to Rule 45A, Ala.R.App.P., we have thoroughly reviewed the record in this case, and we find no error that adversely affected this appellant's rights during the guilt phase or the sentencing phase of this trial. The appellant's convictions for these capital offenses and his sentence of death are proper. The judgment of the trial court is affirmed.
AFFIRMED.
Long, P.J., and Cobb, Baschab, and Fry, JJ., concur.
[1] The record indicates that codefendant Singleton asked the appellant "Is that him?" The appellant replied affirmatively. The record clearly indicates that the trial court understood this, even though it mistakenly stated those facts in its written findings of fact.
[2] Saving Private Ryan was a motion picture showing in movie theaters when this case was tried.
[3] Charlie Boswell, Sr., testified at trial that his middle name was "Louis."