AVISE, Presiding Judge.
 

 The appellant, Melvin Davis, appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P. In 1998, Davis was convicted of capital murder for killing John Bradley and Timothy Ray during one act or pursuant to one course of conduct and during the course of a burglary, of the attempted murder of Eugene Smith, and of conspiracy to murder Charlie Boswell, Jr. He was sentenced to death. Davis’s convictions and sentence were affirmed on direct appeal. See
 
 Davis v. State,
 
 804 So.2d 1153 (Ala.Crim.App.2000). This Court issued the certificate of judgment on June 1, 2001.
 

 In October 2002, Davis filed a petition for postconviction relief pursuant to Rule 32, Ala. R.Crim. P. That petition was dismissed by the circuit court. This Court affirmed the dismissal after finding that Davis had filed his postconviction petition after the limitations period set out in Rule 32.2(c), Ala. R.Crim. P., had expired.
 
 [1]
 
 See
 
 Davis v. State,
 
 804 So.2d 1153 (Ala.Crim.App.2003). However, the Alabama Supreme Court reversed our decision and held that Davis’s Rule 32 petition was timely filed based on the amendment to Rule 32.2(c), Ala. R.Crim. P. See
 
 Ex parte Davis,
 
 890 So.2d 199 (Ala.2004). On remand from the Supreme Court, we remanded Davis’s case to the circuit court for proceedings consistent with the Supreme Court’s opinion. See
 
 Davis v. State,
 
 890 So.2d 200 (Ala.Crim.App.2004).
 

 In January 2006, the circuit court held an evidentiary hearing on Davis’s Rule 32 petition. In June 2006, the court issued a 161-page order denying the petition. Davis then filed a timely notice of appeal to this Court.
 

 The following facts are from the circuit court’s order sentencing Davis to death, which we quote from our opinion on direct appeal:
 

 “ ‘Timothy Ray was twenty-seven years old at the time of his death. He was shot seven times, execution style, at point-blank range. John Bradley was sixty-seven years old at the time of his death and was shot three times, execution style, at point-blank range. Eugene Smith was fifty years old when he was shot execution style in the head. Miraculously, he survived and testified at trial. Charlie Boswell, Jr., was the target of the murders as he was the informant in a drug case that was pending against Davis and his brother, Princeton Davis. Boswell, Jr., was not at the home when the shootings occurred. The roots of this case stem from an earlier drug sale case against Davis. In 1995 and 1996, Davis sold marijuana, along with his brother Princeton Davis, from his family’s apartment in Gibbs Village. The Montgomery Police Department learned of these drug sales and sent an informant, Charlie Boswell, Jr., to make controlled buys. Boswell made several buys from Princeton Davis and one buy from Davis. Based upon these buys, Davis and his brother were arrested and charged with distribution of marijuana. They were subsequently indicted on the offenses.
 

 “ ‘During the pendency of this case, Davis learned of the identity of the informant, Boswell, from his lawyer.
 
 *1123
 
 Davis determined that the way to eliminate the case was to eliminate the informant. Approximately three weeks before the murders, Davis met with Marcus Dunn and codefendants, Derrick Singleton[
 
 2
 
 ] and Antonio Jointer[
 
 3
 
 ] at the house on Caffey Dr., where Davis had moved his drug operation. At this meeting Davis discussed several ways in which to silence the informant. It was decided that Boswell, Jr., would be killed. Boswell, Jr., lived, at times, with his father at 3325 Loveless Curve, which was around the corner from where Davis was selling drugs. Singleton scouted the house and on one occasion drove by it with Dunn to show him where the informant lived.
 

 “ ‘On Thanksgiving night, November 29, 1996, Davis met with Singleton and Jointer to go to the Top Flight Disco. The three drove to the club in Singleton’s Chevrolet Nova. They stayed in the club until closing, which was approximately 2:00 a.m. They then left the club in the same automobile, with Davis driving, Jointer in the front passenger seat, and Singleton in the rear passenger seat. They traveled down High St. to Decatur St. and then turned right on Fairview Ave. Jointer believed that they were taking him to his home which was on Rosa Parks Ave. Instead, at the traffic light at Fairview and Interstate 65, Davis produced a .45 caliber pistol and Singleton produced a .38 caliber pistol, stating, “It’s time.” Jointer knew that they meant it was time to kill the informant. Jointer was unarmed. Davis then drove to Caffey Dr. and then turned onto Loveless Curve, stopping down the street from the house. They then approached the house. Davis banged on the door at 3325 Loveless Curve until the home owner, Charlie Boswell, Sr., came to it. Davis then stated that he was there to see ‘Lewis.’ Boswell replied that Lewis did not live there but, inquired if he meant ‘Eugene,’ who was Eugene Smith, Mr. Boswell’s close friend and roommate. Davis stated that he did, and Mr. Boswell let all three men inside the house. Present in the house with Mr. Boswell were Timothy Ray, who was asleep on a love seat by the front door in the living room, John Bradley, who was asleep on a couch in the living room, and Eugene Smith, who was in the bedroom at the back of the house. Davis and Singleton went to the door of Mr. Smith’s bedroom and Davis asked, “Is that him?” Singleton replied in the affirmative. At trial, Mr. Smith positively identified Davis as one of the men standing at his door. At that point, as Mr. Smith described it, the other one walked to him, placed the gun to his ear and fired. Miraculously, he survived but was seriously wounded. Jointer, who was standing in the hallway, heard the shot and was numb with fear. Davis, Singleton, and Jointer then fled the house. As they were leaving, Davis and Singleton coldly and methodically pumped numerous rounds into Timothy Ray and John Bradley. Mr. Ray was shot seven times at point-blank range with a .45 caliber pistol and a .38 caliber pistol while Mr. Bradley was
 
 *1124
 
 shot three times at point-blank range with .45 caliber and .38 caliber pistols. [Forty-five] caliber shell casings were found in Eugene Smith’s bedroom and in the living room near the bodies of Mr. Smith and Mr. Ray. [Thirty-eight] caliber and .45 caliber slugs were also found in the house and were recovered from the bodies of the victims. Timothy Ray and John Bradley were shot for no reason except they were in the path of the defendants as they fled. Davis told Jointer that if he ever told anyone about the shootings, he would kill him.
 

 “ ‘After the shootings, Davis drove to the Waffle House [restaurant] on West South Blvd. with Singleton and Jointer where they met Davis’s girlfriend, Kaneshia Taylor. Davis and Singleton sat with Taylor and ordered food while Jointer sat by himself at another booth.
 

 “‘For approximately one year this case went unsolved until Dunn, who was facing drug charges, came forward with the information concerning the conspiracy to Idll Charlie Boswell, Jr., initiated by, and to the benefit of, Davis. This statement led the police to Jointer who gave a statement implicating Davis and Singleton in the shootings. Davis, upon being questioned by police, denied any involvement in the shootings but admitted to being with Jointer and Singleton that night.’ ”
 

 804 So.2d at 1155-56.
 

 Standard of Review
 

 This appeal is from the circuit court’s denial of a postconviction petition filed pursuant to Rule 32, Ala. R.Crim. P. According to 32.3, Ala. R.Crim. P.: “The petitioner [has] the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
 

 When reviewing a circuit court’s denial of a Rule 32 petition we apply an abuse-of-discretion standard.
 
 Elliott v. State,
 
 601 So.2d 1118, 1119 (Ala.Crim.App.1992). “When conflicting evidence is presented, however, a presumption of correctness is applied to the court’s factual determinations, and they will not be disturbed unless they are clearly erroneous.”
 
 State v. Hamlet,
 
 913 So.2d 493, 497 (Ala.Crim.App.2005).
 

 Also, the plain-error standard of review does not apply in postconviction proceedings attacking a death-penalty conviction.
 
 Hill v. State,
 
 695 So.2d 1223 (Ala.Crim.App.1997);
 
 Neelley v. State,
 
 642 So.2d 494 (Ala.Crim.App.1993).
 

 In regard to the burden of pleading, this Court in
 
 Boyd v. State,
 
 913 So.2d 1113 (Ala.Crim.App.2003), stated:
 

 “ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’
 
 Boyd v. State,
 
 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion ‘which, if true, entitle[s] the petitioner to relief.’
 
 Lancaster v. State,
 
 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitles a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala.R.Crim.P., to present evidence proving those alleged facts.”
 

 913 So.2d at 1125. In pleading claims of ineffective assistance of counsel, we have stated:
 

 “To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must ‘identify the [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,’
 
 Strickland v. Washington,
 
 466
 
 *1125
 
 U.S. 668, 690, but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating ‘that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ 466 U.S. at 694. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.”
 

 Hyde v. State,
 
 950 So.2d 344, 356 (Ala.Crim.App.2006).
 

 I.
 

 Davis first argues that he was denied the effective assistance of counsel at both the guilt and penalty phases of his capital-murder trial.
 
 [4]
 

 When reviewing claims of ineffective assistance of counsel we apply the standard announced by the United States Supreme Court in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that a petitioner has been deprived of the effective assistance of counsel, the petitioner must show: (1) that counsel’s performance was deficient; and (2) that he was prejudiced by the deficient performance.
 

 “Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf.
 
 Engle v. Isaac,
 
 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See
 
 Michel v. Louisiana,
 
 [350 U.S. 91], at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
 

 466 U.S. at 689, 104 S.Ct. 2052. As the United States Supreme Court further stated:
 

 “[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”
 

 466 U.S. at 690-91, 104 S.Ct. 2052.
 

 “ ‘[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See
 
 Strickland [v. Wash
 
 
 *1126
 

 ington
 
 ], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also
 
 White v. Singletary,
 
 972 F.2d 1218, 1221 (11th Cir.1992)(“We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.”). We recognize that “[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.”
 
 Strickland,
 
 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.”
 
 Burger v. Kemp,
 
 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).
 

 [[Image here]]
 

 “ ‘Because the reasonableness of counsel’s acts (including what investigations are reasonable) depends “critically” upon “information supplied by the [petitioner]” or “the [petitioner’s own statements or actions,” evidence of a petitioner’s statements and acts in dealing with counsel is highly relevant to ineffective assistance claims.
 
 Strickland,
 
 104 S.Ct. at 2066. “[An] inquiry into counsel’s conversations with the [petitioner] may be critical to a proper assessment of counsel’s investigation decisions, just as it may be critical to a proper assessment of counsel’s other litigation decisions.”
 
 Id.
 
 (“[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.”).’
 

 “Chandler v. United States,
 
 218 F.3d 1305, 1313-19 (11th Cir.2000) (footnotes omitted).”
 

 Gaddy v. State,
 
 952 So.2d 1149, 1157 (Ala.Crim.App.2006).
 

 “ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore “where the record is incomplete or unclear about [counsel’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’
 
 Chandler v. United States,
 
 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting
 
 Williams v. Head,
 
 185 F.3d 1223, 1228 (11th Cir. 1999)).”
 

 Grayson v. Thompson,
 
 257 F.3d 1194, 1218 (11th Cir.2001).
 

 Davis was represented at trial by attorneys Paul Copeland and David Belser. Both attorneys testified at the postconviction evidentiary hearing. On appeal, Davis was represented by Daniel Hamm. Hamm also testified at the evidentiary hearing.
 
 [5]
 

 A.
 

 Davis first argues that his trial counsel were ineffective for failing to interview all the State’s witnesses. Davis specifically argues that counsel were ineffective for failing to interview what he characterizes as two alibi witnesses — Son
 
 *1127
 
 ya Walker and Melinda Clayton.
 
 [6]
 
 When addressing this claim, the circuit court stated:
 

 “At the evidentiary hearing, Davis called two of Kaneshia Taylor’s Mends, Sonya Walker and Melinda Clayton. It appears clear that Taylor, Walker, Clayton, Antonio Jointer, Derrick Singleton, and Melvin Davis went out on Thanksgiving night in 1996. Walker’s and Clayton’s testimony about the details of the evening differed from Taylor’s trial testimony in certain respects. Taylor testified at trial that after the group got to the Top Flight Club, the girls left and went to the 747 Club and that later the girls got to the Waffle House [restaurant] before the men. Walker and Clayton testified at the evidentiary hearing that the girls stayed at the Top Flight Club until it closed and that the men arrived at the Waffle House first.
 

 “Even if Walker’s and Clayton’s testimony had been offered to impeach Taylor’s testimony, the Court finds it would not have changed the outcome of Davis’s trial. Walker did not recall a shooting incident in [the] parking lot of the Top Flight Club and said she saw Marcus Dunn at the Club during the night. Clayton, on the other hand, did recall the parking lot incident and said she did not recall seeing Dunn at Top Flight on the night in question. Further, Walker indicated during cross-examination that she had witnessed Davis and his brother, Princeton, selling marijuana from their mother’s apartment in Gibbs Village. In light of the evidence presented at trial, the Court finds that Davis’s trial counsel were not ineffective for failing to present Walker’s and Clayton’s testimony. The Court finds that Davis failed to prove he was prejudiced because Walker and Clayton were not called to testify at the guilt phase of his trial. Rules 32.2(c) and 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 809-10.)
 

 “ ‘[The] failure to conduct a pretrial investigation and interview witnesses is not a per se sixth amendment violation.’
 
 Code v. Montgomery,
 
 799 F.2d 1481, 1484 (11th Cir.1986). A counsel’s decision to not investigate ‘must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.’
 
 Strickland [v. Washington
 
 ], 466 U.S. [668] at 691 [ (1984) ]. Also, the question of deficient performance “ ‘is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.” ’
 
 Payne v. Allen,
 
 539 F.3d 1297, 1315 (11th Cir.2008) (quoting
 
 Burger v. Kemp,
 
 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).”
 

 Hall v. Thomas,
 
 623 F.Supp.2d 1302, 1318 (M.D.Ala.2009). See
 
 Aldrich v. Wainwright, 777
 
 F.2d 630, 636-37 (11th Cir. 1985);
 
 McCleskey v. Kemp,
 
 753 F.2d 877, 900 (11th Cir.1985) (en banc);
 
 Boykins v. Wainwright,
 
 737 F.2d 1539, 1543 (11th Cir. 1984);
 
 Solomon v. Kemp,
 
 735 F.2d 395, 402 (11th Cir.1984). See
 
 Commonwealth v. Johnson,
 
 966 A.2d 523, 536 (Pa.2009) (“[S]uch a per se failing [to interview witnesses], of course, does not make out a ease of prejudice, or overall entitlement to
 
 Strickland
 
 relief.”);
 
 Sanders v. Trickey,
 
 875 F.2d 205, 209 (8th Cir.1989) (“[N]o per se rule that failure to interview witnesses constitutes ineffective assistance of counsel.”);
 
 United States v. Glick,
 
 710 F.2d 639, 644 (10th Cir.1983) (“[a]n attorney’s decision not to interview witnesses and to rely on other sources of information, if
 
 *1128
 
 made in the exercise of professional judgment, is not ineffective counsel”).
 

 Walker testified at the evidentiary hearing that she, Kaneshia Taylor, Melinda Clayton, Melvin Davis, Derrick Singleton, and Antonio Jointer went to the Top Flight Disco night club on the night of the murders. She said that she rode with Taylor and Clayton and that they met the others at the club. They stayed at the club until closing,'she said, and then left separately and met at a Waffle House restaurant around 2:00 a.m. or 2:30 a.m. She said that Davis, Singleton, and Jointer left the club first and that the men arrived at the Waffle House before the women arrived. Walker also testified that before trial one of Davis’s lawyers contacted her and asked her if she would be willing to testify in Davis’s behalf. She said that she and Clayton were at the courthouse for Davis’s trial but that the attorney informed them that they would not be needed. On cross-examination at the evidentia-ry hearing Walker testified that she had seen Davis and his brother selling drugs from their home in Gibbs Village.
 

 Melinda Clayton testified that the group went to the Top Flight Disco on Thanksgiving night in 1996. She said that they were going to meet at a Waffle House restaurant when the club closed at 2:00 a.m. Clayton said that they were delayed leaving the Club about 45 minutes because there was a shooting in the parking lot. She said that they got to the Waffle House after 3:00 a.m. and that Davis, Singleton, and Jointer were already there.
 

 Copeland testified that he did not interview Walker or Clayton. Belser was not specifically asked if he interviewed Walker or Clayton.
 

 Witnesses at Davis’s trial testified that the murders occurred around 2:00 a.m. Neither Walker nor Clayton offered Davis an alibi for the night in question.
 
 [7]
 
 Their testimony, at most, tended to conflict with portions of Kaneshia Taylor’s testimony. Taylor testified at trial that she, Clayton, and Walker went to the Top Flight Disco on Thanksgiving night in 1996 and that the line was too long so they left and went to 747 Club. Taylor further testified that they went back to the Top Flight Disco at around 2:00 a.m. but there was a “conflict” in the parking lot so they met Davis, Singleton, and Jointer at a Waffle House.
 

 Moreover, Marcus Dunn testified that Davis and his brother Princeton were arrested after a confidential informant, Charlie Boswell, Jr., reported to police that they were selling drugs. Dunn said that he, Davis, and Singleton discussed how they could stop Boswell from testifying against Davis and his brother. On the night of the murders Davis paged him, he said, and he knew what it meant but he did not answer the page because he was babysitting his daughter. Dunn further testified that sometime after the shooting Davis told him that they had “hit the wrong house.”
 

 Antonio Jointer testified that Davis told him that he had discovered the name of the confidential informant from his attorney and that Davis wanted to kill the informant. Jointer said that on the night of the murders Davis picked him up at his house, that they went back to Davis’s house and he retrieved something from the
 
 *1129
 
 house, that Singleton pulled up, and that the three went to the Top Flight Disco. Jointer said that when the club was about to close they left. He testified that when they reached the interstate Davis stopped the vehicle, he pulled out a gun, and said “it was time.” Singleton had a revolver and Davis an automatic weapon, Jointer said, but he was not armed. They pulled up in front of a house on Loveless Curve and Davis knocked on the door. They all entered the house and walked to the rear. Davis and Singleton started shooting. They all left and went to a Waffle House restaurant. Jointer’s testimony surrounding the murders was consistent with the details of the murders that police had not released to the public.
 

 Charlie Boswell, Sr., testified that at around 2:00 a.m. on the night of the murders someone knocked on the door of his house on Loveless Curve. He did not answer immediately because he thought that Eugene Smith, John Bradley, or Timothy Ray, who were staying at his house, would answer the door. Boswell testified that three young males were at the door, that he could not identify the males because it was dark and no lights were on in the front of the house, and that he led them to Smith’s room in the back of the house. Boswell said that he went back to his room and he then heard several gunshots.
 

 “‘To establish prejudice from counsel’s failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony “would have probably changed the outcome of the trial.” ’
 
 [Hadley v. Groose,
 
 97 F.3d 1131 (8th Cir.1996)] (quoting
 
 Stewart v. Nix,
 
 31 F.3d 741, 744 (8th Cir.1994) (emphasis added)). In conducting this analysis, we will consider: ‘(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.’
 
 McCauley-Bey v. Delo,
 
 97 F.3d 1104, 1106 (8th Cir.1996).”
 

 Siers v. Class,
 
 581 N.W.2d 491, 497-98 (S.D.1998).
 

 Based on the fact that Walker and Clayton offered inconsistent versions of what happened on the night of the murders and on the overwhelming evidence presented against Davis, we hold that the failure to interview and present the testimony of Walker or Clayton did not result in any prejudice to Davis. Accordingly, Davis failed to satisfy the requirements of
 
 Strickland
 
 and was due no relief.
 

 B.
 

 Davis next argues that his attorneys were ineffective because, he says, they did not begin to prepare for his trial until five days before it was scheduled to begin. He relies on the fee declarations and time sheets submitted by his two appointed attorneys.
 

 Initially, we note that this specific claim was not raised in Davis’s Rule 32 petition. Thus, it is not properly before this Court. “An appellant cannot raise an issue from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.”
 
 Arrington v. State,
 
 716 So.2d 237, 239 (Ala.Crim.App.1997).
 

 Moreover, this claim is not supported by the record. Both attorneys testified that they spent time on the case that they did not record on their fee sheets and that both began work on the ease when they were appointed. Davis was due no relief on this claim.
 

 
 *1130
 
 C.
 

 Davis next argues that his attorneys were ineffective for failing to meet with their client in a “timely and reasonable manner.”
 

 The circuit court stated the following when addressing this claim:
 

 “[Davis] attempts to raise a claim of ineffective assistance by contending his trial counsel met with him ‘on only a few occasions in the time that elapsed between counsel’s appointment and the beginning of trial.’ Davis’s only attempt to support this assertion is his contention that ‘[t]his limited number of visits greatly compromised [his] right to assist in his own defense and impeded any efforts to formulate a reasonable coherent defense theory.’
 

 “Davis never complained to this Court he was dissatisfied with Copeland or Belser because they did not visit or confer with him before trial. Further, Davis did not testify at the evidentiary hearing, so there is nothing before this Court proving that if his trial counsel had visited him more before his trial the outcome of the guilt phase might have been different.
 

 “The Court finds that this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R.Crim. P. In the alternative, the Court finds Davis failed to carry his burden of proving he was prejudiced as required by Rule 32.2(c), Ala. R.Crim. P. Rule 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 811.)
 

 The attorney-fee declarations completed by both Davis’s attorneys are contained in the record certified to this Court. Copeland’s time sheet shows that he met with Davis on three different occasions, for a total of 8.5 hours. Belser’s time sheet shows that he met with Davis on four occasions, for a total of 9.8 hours. Both attorneys testified that they did not bill for all the time they spent on the case. Copeland billed for 157.9 hours and Belser for 120.4 hours.
 

 “We know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel.”
 
 United States ex rel. Kleba v. McGinnis,
 
 796 F.2d 947, 954 (7th Cir.1986). “[B]revity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel.
 
 Jones v. Wainwright,
 
 604 F.2d 414, 416 (5th Cir.1979).”
 
 Murray v. Maggio,
 
 736 F.2d 279, 282 (5th Cir.1984). Here, Davis makes no specific argument as to how any more meetings between Davis and his attorneys would have been beneficial to his defense. Davis failed to satisfy the requirements of
 
 Strickland.
 

 D.
 

 Davis next argues that counsel were ineffective for failing to conduct an independent investigation of the State’s case against Davis. Specifically, he asserts that counsel did not examine the physical evidence at the crime scene.
 

 The circuit court stated the following when addressing this claim:
 

 “[Davis] alleges his trial counsel were ineffective for ‘fail[ing] to adequately investigate the [S]tate’s conduct in investigating [his] case.’ In support of this allegation, the Court permitted Davis to submit the depositions of Ralph Robert Tressel and Ross M. Gardner, both experts in crime seene analysis.
 

 “Tressel and Gardner testified about what they considered were deficiencies in the Montgomery Police Department’s investigation and processing of the crime scene at Loveless Curve, including failing to examine finger prints. Tressel
 
 *1131
 
 and Ross also said they believed the crime scene diagram prepared in this case contained errors. Both indicated that because seven .38 caliber bullets were recovered from the victims and the crime scene that it is possible two .38 caliber guns were used in the incident. Tressel and Gardner indicated that, based on their review of documentation, the crime scene video, and certain trial testimony, they could find no physical evidence linking Davis to the crime scene at Loveless Curve.
 

 “The events at Loveless Curve occurred one year and five months before Copeland and Belser were appointed to represent Davis. Tressel and Ross indicated they have not visited the crime scene and had not performed any analysis of the physical evidence. While Tressel and Ross testified they could find no evidence linking Davis to the scene, they also indicated they could find nothing linking any other specific individual to the crime scene.
 

 “The Court is aware that in certain criminal cases an expert in crime scene analysis could be of great value to a defendant’s case. The Court finds, however, that this is not one of those cases. After reviewing the depositions of Tres-sel and Ross in the light of the evidence presented at Davis’s trial, the Court finds that Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced by his trial counsel’s failure to retain a crime scene investigator. Rules 32.2(c), and 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 814-15.)
 

 Ralph Robert Tressel and Ross M. Gardner, both consultants in crime-scene analysis, were deposed for the Rule 32 proceedings. Both said that Davis’s attorneys failed to challenge the forensic evidence. However, there was no showing that Davis was prejudiced by counsel’s failure to challenge the State’s evidence. The experts conducted no tests on any of the evidence and offered no testimony to contradict the evidence that was presented at Davis’s trial. Both testified that there was no physical evidence collected from the crime scene that linked Davis to the murders. However, the lack of physical evidence was a main argument of defense counsel at trial. We agree with the post-conviction court that Davis failed to satisfy the requirements of
 
 Strickland.
 

 Davis further argues in this section of his brief that counsel were ineffective for failing to investigate and present alternative theories of the case.
 

 When addressing this claim, the circuit court stated:
 

 “Davis identified four individuals as other suspects and two individuals as other witnesses [in his postconviction petition]. Davis, however, did not present any specific information at his evidentiary hearing that his trial counsel could have discovered and presented that could have made a difference in the outcome of his trial.
 

 “Because Davis failed to pursue this allegation of ineffective assistance at the evidentiary hearing, the Court finds that he has abandoned it.
 
 See Burgess v. State,
 
 [962 So.2d 272 (Ala.Crim.App.2005) ] (holding Burgess had abandoned claim his trial counsel was ineffective for failing to object to victim-impact-evidence introduced at sentencing where he did not present evidence at the Rule 32 hearing to support it). In the alternative, the Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced as required by Rule 32.2(c), Ala. R.Crim. P. Rule 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 811-12.)
 

 
 *1132
 
 At Davis’s trial
 
 [8]
 
 his attorneys vigorously argued in closing that Smith could not identify the person who shot him and had in fact twice named another individual, that two fingerprints found at the scene could not be identified, and that there was no physical evidence at the murder scene connecting Davis to the murders. They further argued that Officer Guy Naquin testified that he interviewed Yulonda Bel-ser and she said that she overheard two people talking about murdering one of the victims and that Davis was not one of two individuals. Counsel attacked the State’s case and argued that there was reasonable doubt on which to acquit Davis.
 

 In the postconviction proceedings Davis asserts that counsel should have argued alternative theories. However, he provided no factual support nor did he present any witnesses at the evidentia-ry hearing to support this claim. As one court stated in a similar case:
 

 “Rose posits no viable alternative theories to account for Aldape’s allegations, nor does he specify what other defenses his attorney should have advanced. Mere conclusory allegations in support of claims of ineffective assistance of counsel, such as those made by Rose, are insufficient as a matter of law to raise a constitutional issue. See
 
 Miller v. Johnson,
 
 200 F.3d 274, 282 (5th Cir.), cert. denied, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000);
 
 Kinnamon v. Scott,
 
 40 F.3d 731, 735 (5th Cir.), cert. denied, 513 U.S. 1054, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994);
 
 Flores v. Johnson,
 
 957 F.Supp. 893, 910 (WD.Tex.1997). In the absence of a specific showing of the manner in which counsel’s alleged errors and omissions were constitutionally deficient and how they prejudiced his right to a fair trial, a habeas petitioner [
 
 9
 
 ] cannot prevail on an ineffective assistance of counsel claim. See
 
 Miller,
 
 200 F.3d at 282;
 
 Barnard v. Collins,
 
 958 F.2d 634, 642 n. 11 (5th Cir.1992), cert. denied, 506 U.S. 1057, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993).”
 

 Rose v. Johnson,
 
 141 F.Supp.2d 661, 689-90 (S.D.Tex.2001). “ ‘[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel’s failure to present that theory.’ ”
 
 Hunt v. State,
 
 940 So.2d 1041, 1067 (Ala.Crim.App.2005), quoting
 
 Rosario-Dominguez v. United States,
 
 353 F.Supp.2d 500, 513 (S.D.N.Y.2005). “Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel.”
 
 People v. Eisemann,
 
 248 A.D.2d 484, 484, 670 N.Y.S.2d 39, 40-41 (1998).
 

 Davis failed to satisfy the requirements of
 
 Strickland
 
 and was due no relief on this claim.
 

 E.
 

 Davis next argues that his trial counsel were ineffective for failing to consult or retain experts and for failing to cross-examine the State’s experts. Davis identifies no specific expert in this section of his brief to this Court. Davis does argue that according to the American Bar Association Guidelines relative to the appointment of counsel in a death-penalty case, his counsel’s performance was deficient.
 

 The circuit court stated the following in regard to this claim:
 

 “Davis first alleges that his trial counsel were ineffective for not securing the
 
 *1133
 
 assistance of a forensic pathologist, contending that a pathologist ‘would have assisted [Davis] in establishing that the [Sjtate’s evidence was speculative and not probative and at [a] minimum, would have been of assistance in the cross-examination of the [S]tate’s experts.’
 

 “This conclusory statement is Davis’s only attempt to support this allegation. Davis proffered no facts that, if presented at trial, could have undermined the testimony of the State medical examiner regarding the cause of death of the victims. Davis also failed to proffer in his Rule 32 petition or at his evidentiary hearing a single cross-examination question his trial counsels could have asked that would have impeached the State’s pathologist. Further, since Davis’s defense was that he did not participate in the shootings at Boswell, Sr.’s house, the Court cannot think of why challenging the State’s evidence of how the victims were murdered would have been beneficial to Davis’s defense.
 

 “Because Davis did not present any evidence to prove this allegation of ineffective assistance, the Court finds Davis has abandoned it. See
 
 Burgess v. State,
 
 [962 So.2d 272 (Ala.Crim.App.2005) ] (holding Burgess had abandoned claim his trial counsel was ineffective for failing to object to victim-impact evidence introduced at sentencing where he did not present evidence at the Rule 32 hearing to support it). In the alternative, the Court finds Davis failed to carry his burden of proving he was prejudiced by a preponderance of evidence as required by Rule 32.2(c), Ala. R.Crim. P. Rule 32.76(d), Ala. R.Crim. P.
 

 “Davis contends that his trial counsel were ineffective for not requesting funds for an investigator and a fingerprint expert. Davis contends that a fingerprint expert ‘would have been able to assist trial counsel in understanding the flaws in the [SJtate’s fingerprint evidence.’ Davis also contends that ‘[h]ad an investigator interviewed the potential witnesses identified by [Davis], critical information would have been discovered and presented that would have altered the outcome at trial.’ Davis further contends that his trial counsel should have retained a traffic expert because, according to Davis, ‘[t]he timeline the [S]tate gave of these events was highly improbable.’
 

 “As stated previously, Davis did not identify in his Rule 32 petition or at his evidentiary hearing one specific flaw in the analysis of the State’s fingerprint expert. Davis also failed to offer at his evidentiary hearing any evidence as to what a traffic expert might have testified about.
 

 “Because Davis did not present any evidence to prove these allegations of ineffective assistance, the Court finds Davis has abandoned them.”
 

 (C.R. 838-40.)
 

 Only two experts testified at Davis’s trial — the medical examiner and a firearms expert. The medical examiner, Gregory Wanger, testified that Timothy Ray died of seven gunshot wounds to his head, chest, back, abdomen, and right thigh. Dr. Wan-ger further testified that John Bradley died of three gunshots wounds to his head and upper back. The causes of death were not contested at trial or in the Rule 32 proceedings.
 

 Two fingerprints that could not be identified were recovered from the crime scene. However, Davis offered no evidence at the postconviction hearing showing how the State’s fingerprint evidence was flawed. Likewise, Davis failed to offer any evidence as to why counsel were ineffective for failing to obtain the assistance of a traffic expert.
 

 
 *1134
 
 Moreover, the United States Supreme Court in
 
 Strickland v. Washington
 
 stated:
 

 “As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance....
 

 “More specific guidelines are not appropriate. The Sixth Amendment refers simply to ‘counsel,’ not specifying particular requirements of effective assistance. It relies instead on the legal profession’s maintenance of standards sufficient to justify the law’s presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See
 
 Michel v. Louisiana,
 
 350 U.S. 91, 100-101, 76 S.Ct. 158, 163-164, 100 L.Ed. 83 (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.
 

 [[Image here]]
 

 “... In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel’s assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed.1980) (‘The Defense Function’), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel’s conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See
 
 United States v. Decoster,
 
 199 U.S.App.D.C., at 371, 624 F.2d, at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant’s cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.”
 

 466 U.S. at 687-89, 104 S.Ct. 2052. See also
 
 Roe v. Flores-Ortega,
 
 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (“ ‘[Pjrevailing norms of practice as reflected in American Bar Association standards and the like ... are only guides,’ and imposing ‘specific guidelines’ on counsel is ‘not appropriate.’ ”).
 

 Davis failed to present any evidence in support of these claims; thus, he failed to meet his burden of proof.
 

 F.
 

 Next, Davis argues that counsel were ineffective for failing to properly cross-examine and challenge the credibility of witnesses Antonio Jointer and Eugene Smith.
 

 The circuit court made the following findings of fact on Davis’s claim that counsel failed to attack Jointer’s credibility:
 

 “[Davis] contends his trial counsel were ineffective for failing to impeach Antonio Jointer’s testimony with apparent inconsistencies between his testimony and the testimonies of Kaneshia Taylor and Eugene Smith.
 

 “The Court first notes that Davis did not call Jointer, Kaneshia Taylor, or Eugene Smith to testify at the evidentiary hearing. Further, during Jointer’s cross-examination, Copeland elicited that although he was charged with capi
 
 *1135
 
 tal murder, Jointer was testifying without a plea agreement with the State. Copeland also presented Jointer’s assertion he was forced into the house on Loveless Curve at gunpoint. Copeland also got Jointer to admit that he had initially lied to police and told them he had not gone to the house on Loveless Curve. Copeland also got Jointer to admit he had seen Davis since the murders despite Jointer’s claim that Davis had threatened to kill him and that he was scared of Davis. Further, Davis completely ignores that during Copeland’s guilty phase closing argument he vigorously argued that Jointer’s testimony was not credible.
 

 “Based on this Court’s personal knowledge of Copeland’s cross-examination of Jointer, the Court finds that this allegation of ineffective assistance is without merit. In the alternative, the Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced as required by Rule 32.2(c), Ala. R.Crim. P. Rule 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 821-22.) The record supports the circuit court’s findings. Counsel thoroughly cross-examined Jointer and attacked his credibility. “The method and scope of cross-examination ‘is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.’ ”
 
 State ex rel. Daniel v. Leqursky,
 
 195 W.Va. 314, 328, 465 S.E.2d 416, 430 (1995). Davis was due no relief on this claim.
 

 The circuit court stated the following in regard to Davis’s claim that counsel failed to attack Smith’s credibility:
 

 “[Davis] contends that trial counsel were ineffective for failing to ‘adequately’ cross-examine Eugene Smith about the fact that he identified people other than Davis as the one that shot him. Davis also contends his trial counsel were ineffective for not impeaching Smith’s testimony with his inconsistent statements to police.
 

 “At the evidentiary hearing, Belser indicated he and Copeland did not consider hiring an expert on memory and, instead, relied on cross-examining witnesses. At the evidentiary hearing, Davis presented the testimony of Dr. Solomon Fulero, a psychologist specializing in memory and line-up techniques. Fulero testified about the process of acquiring, retaining, and retrieving memories. Fulero also discussed factors that could affect the accuracy of a particular memory, including exposure to the event, whether a weapon was used, stress, lighting, and a witness’s age and whether they had used alcohol or drugs. Fulero also indicated that memories fade over time and people can forget events rapidly. Fulero testified that post-event information, such as being exposed to multiple line-ups, can affect a witness’s memory and that there is almost no relationship between a witness’s confidence in an identification of a suspect and the accuracy of the identification.
 

 “In light of Davis’s trial counsel’s performance, the Court finds the fact they did not call an eyewitness expert to testify did not cause [Davis] to be prejudiced. Belser vigorously cross-examined Smith about his statements to police. Further, Detective [Derrick] Cunningham testified about Smith’s description of the subjects [who] entered Boswell’s house and indicated that Smith gave numerous names of suspects and would give police the names of people from newspapers and television as possible suspects. Cunningham also indicated that Smith changed his story several times and seemed con
 
 *1136
 
 fused. Copeland and Belser entered into stipulation with the State that shortly after Smith had identified Davis in a photo line-up that he could not identify Davis from the same line-up. During his closing arguments, Copeland emphasized that Boswell’s Sr.’s and Smith’s testimonies were different and vigorously attacked the credibility of Smith’s testimony.
 

 “Based on this Court’s personal knowledge of trial counsel’s performance, the Court finds these allegations of ineffective assistance are without merit.... In the alternative, the Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced by his trial counsel’s failure to retain an expert on eye-witness identification and memory. Rule 32.2(c) and 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 823-25.)
 

 Davis argued that counsel were ineffective for failing to retain the services of a expert in eyewitnesses identifications to impeach Smith’s testimony. However, “‘[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.’”
 
 State v. Hartman,
 
 93 Ohio St.3d 274, 299, 754 N.E.2d 1150, 1177 (2001), quoting
 
 State v. Nicholas,
 
 66 Ohio St.3d 431, 436, 613 N.E.2d 225, 230 (1993). Decisions “ ‘[w]hether to engage in cross examination, and if so to what extent and in what matter, are ... strategic in nature’ and generally will not support an ineffective assistance claim.”
 
 Dunham v. Travis,
 
 313 F.3d 724, 732 (2nd Cir.2002).
 

 The record of Davis’s trial shows that Smith was thoroughly cross-examined concerning his difficulties in identifying the individuals involved in the shootings. Detective Derrick Cunningham of the Montgomery Police Department also detailed Smith’s difficulties in identifying the shooters. Counsel did an admirable job of attacking Smith’s credibility. Thus, the circuit court correctly denied relief on this claim.
 

 G.
 

 Davis next argues that counsel were ineffective for agreeing to a stipulation regarding Eugene Smith’s identification of Davis based on a photographic lineup. At trial, defense counsel agreed to the following stipulation:
 

 “On August 23, 1998, Eugene Smith met with Randy McNeill [deputy district attorney] to discuss trial testimony. Present at the meeting was his sister, Mary Glover. Mr. McNeill knew that he had not previously been shown a lineup of the defendant, including the defendant, Melvin Davis. So, therefore, Mr. McNeill asked him if he thought he could identify the man who shot him if he was shown a lineup. He stated he could.
 

 “Mr. McNeill then produced a photo lineup containing the defendant’s picture, which has been introduced as evidence, and I believe it is marked as Defendant’s Exhibit 4. Mr. McNeill did not prompt him to suggest to him the identity of the defendant. Mr. Smith studied the lineup for less than ten seconds and then emphatically stated that number four, who was in fact, Mr. Davis, was the person that stood at the door and was the man — and was with the man who shot him. Mr. McNeill then asked him if he was certain, in which he stated that this was the defendant. And Mr. Smith reiterated that the defendant did not shoot him but was present when he was shot.
 

 “Approximately fifteen minutes later, Mr. Smith was again shown the lineup by [an investigator in the district attorney’s office] and was asked if he could
 
 *1137
 
 identify the person who shot him. Mr. Smith seemed confused and acted as if he had not previously been shown the lineup and stated that he recognized number six and number two who were in the photo lineup.
 

 “Mr. McNeill did not question him any further because he seemed confused.”
 

 (Trial record, 838-40.)
 

 We do not know why counsel agreed to this stipulation. Neither Copeland nor Belser were asked at the evidentiary hearing the purpose of this stipulation. As we previously stated, when the record is silent as to why counsel pursued a specific course, we must assume that counsel’s actions were reasonable. See
 
 Grayson v. Thompson,
 
 supra.
 

 Moreover, on direct appeal we noted that the stipulation appeared to be “favorable to [Davis].” See
 
 Davis v. State,
 
 804 So.2d at 1162. Davis failed to show how he was prejudiced.
 

 II.
 

 Davis next argues that he was denied the effective assistance of counsel during the penalty phase of his capital trial.
 

 When reviewing claims of ineffective assistance of counsel during the penalty phase of a capital trial we apply the following legal standards.
 

 ‘When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is ‘a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’
 
 Strickland [v. Washington],
 
 466 U.S. [668,] at 695, 104 S.Ct. [2052,] at 2069 [ (1984) ].”
 

 Stafford v. Saffle,
 
 34 F.3d 1557, 1564 (10th Cir.1994).
 

 In
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court in reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:
 

 “In
 
 Strickland [v. Washington,
 
 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’
 
 Id.,
 
 at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
 

 539 U.S. at 534, 123 S.Ct. 2527.
 

 “ ‘The reasonableness of counsel’s investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. E.g.
 
 Commonwealth v. Uderra,
 
 550 Pa. 389, 706 A.2d 334, 340-41 (1998) (collecting cases). Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel.’ ”
 

 Waldrop v. State,
 
 987 So.2d 1186, 1195 (Ala.Crim.App.2007), quoting
 
 Commonwealth v. Bond,
 
 572 Pa. 588, 609-10, 819 A.2d 33, 45-46 (2002).
 

 “ ‘A defense attorney is not required to investigate all leads, however, and “there is no per se rule that evidence of a criminal defendant’s troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case.’”
 
 Bolender [v. Single-
 
 
 *1138
 

 tary
 
 ], 16 F.3d [1547,] at 1557 [(llth Cir.1994) ] (footnote omitted) (quoting
 
 Devier v. Zant,
 
 3 F.3d 1445, 1453 (11th Cir.1993), cert. denied, [513]
 
 U.S. [1161],
 
 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995)). ‘Indeed, “[e]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel’s failure to present mitigating evidence is not per se ineffective assistance of counsel.” ’
 
 Bolender,
 
 16 F.3d at 1557 (citations omitted).”
 

 Marek v. Singletary,
 
 62 F.3d 1295, 1300 (11th Cir.1995).
 

 A.
 

 Davis asserts that counsel were ineffective for failing to investigate and present mitigation evidence at the penalty phase concerning his life and character.
 

 The circuit court stated the following when denying relief on this claim:
 

 “In
 
 Waters v. Thomas,
 
 46 F.3d 1506, 1514 (11th Cir.1995) (en banc), the Eleventh Circuit held that ‘[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.’ This Court is also aware that evidence in mitigation in the penalty phase of a capital murder trial is a two-way street. While a capital defendant may present any evidence that is relevant as to why jurors should recommend the defendant be sentenced to less than death, such a presentation will give the State the opportunity through cross-examination of defense witnesses or through presenting rebuttal evidence to present evidence that could be prejudicial to the defendant.
 

 “The testimony and evidence presented during these proceedings indicated that Davis was a good brother to his sibling and supported his family. Davis was gainfully and lawfully employed and contributed to the financial support of his family. He grew up in Gibbs Village, a rough neighborhood in Montgomery. Testimony indicated that in his youth, Davis did not engage in acts of violence and, on occasion, helped to prevent violence. It appears Davis was loved and respected by members of his family, by many of his peers, and by other adults. During his childhood, he and his sibling witnessed his mother being physically abused by Willis Davis, Sr.
 

 “The testimony presented in these proceedings that despite having the intelligence and ability to [obtain] lawful employment or further his education, Davis made the conscious decision to sell marijuana to make money. Witnesses testified about Davis and Princeton selling marijuana and making good money. The fact that Davis may have sold marijuana to support his family claimed by one of his brothers, would not lessen its affect.
 

 “Moreover, even if the testimony and evidence presented in connection with these Rule 32 proceedings had been presented at Davis’s trial, this Court is convinced beyond any doubt that there is no reasonable probability the outcome at the penalty phase might have been different. Davis was 25 years, 4 months old when he committed the offenses underlying these proceedings. The State proved beyond any reasonable doubt the existence of three aggravating circumstances. Instead of relying on the judicial system after being arrested for selling marijuana, Davis formulated a plan to murder the confidential police informant that was going to testify against him and his brother. The manner in which Davis committed these offenses was cold, callous, and demonstrated a
 
 *1139
 
 complete disregard for the dignity of human life. The evidence presented at the evidentiary hearing by Davis and the State proved beyond all doubt that Davis knew right from wrong, also that Davis was solely responsible for conceiving a chain of events that resulted in two completely innocent people being killed and another being seriously wounded.
 

 “Even if this Court were to find that Copeland’s investigation for mitigating evidence was not as extensive as his collateral counsel, Davis would not be entitled to relief because he has failed to prove he was prejudiced.
 
 See Boyd v. State,
 
 746 So.2d 364, 379 (Ala.Crim.App.1999) (holding that ‘even if the alleged failure to present mitigating evidence was an oversight and not a tactical choice by counsel, it was harmless’).
 

 “Davis’s allegation his trial counsel were ineffective in their presentation of mitigating evidence is dismissed. Rules 32.3 and 32.7(d), Ala. R.Crim. P.”
 

 (C.R. 896-99.)
 

 We agree with the circuit court’s findings. At the postconviction hearing, Davis presented the following witnesses:
 

 Family members.
 
 Charleston Davis testified that he was Davis’s younger brother and the youngest of six boys, that Davis was like a father to him while he was growing up, and that Davis helped to support his family. However, on cross-examination he stated that he was 14 years of age at the time of Davis’s trial. Mario Davis testified that Davis supported the family by selling drugs and that he was like a father to him. Princeton Davis testified that Davis was like a father to him, that his mother frequently beat him and that Davis would attempt to intervene on his behalf, that his brother’s father, Willis Davis, would beat their mother, that Davis sold drugs to help the family, and that he was in prison at the time of Davis’s trial. Patricia Davis, Davis’s mother, testified that she and her six children moved to Gibbs Village in 1976, that she worked at Jackson Hospital, that she paid a neighbor to watch the children while she was working, that the Department of Human Resources was called when it was discovered that the neighbor was sending the children back to their house to stay alone, that the father of two of her children was abusive to her, that Davis witnessed some of this abuse, and that when Davis got older he helped pay the bills. However, on cross-examination she testified that she got a large cash settlement when Davis’s father was killed when Davis was 16 years old, that she provided for her children, that she bought Davis and Princeton vehicles, that she received money from the Veterans Administration for Davis, that she received child support from the fathers of the boys, and that she worked as a nurse from 1978 until 1995.
 

 Friends.
 
 Valerie Taylor testified that her daughter, Kaneshia, is the mother of one of Davis’s children, that Davis regularly communicated with his daughter, and that Davis was like part of her family. Sonya Walker testified that Davis was like a brother to her, that he was not violent, that he was always trying to break up fights, and that he was good to his siblings. On cross-examination Walker testified that she had seen Davis and his brother sell marijuana from their house in Gibbs Village. Melinda Clayton testified that she had known Davis for 20 years, that she considered Davis to be like a “big brother” to her, that he was not violent, that Davis raised his younger siblings, and that he supported his siblings. John Gilcrest, Jr., testified that he lived at Gibbs Village when Davis’s family lived there and that Davis was never a problem. Rosa Payne, who had known Davis for most of his life, testified that Davis helped his siblings and
 
 *1140
 
 that he was never in trouble but was always breaking up fights in Gibbs Village. Otis Barnes said that he met Davis when they were both at Carver High School, that Davis was respected at the school, and that Davis helped with the gang situation at the school.
 

 Coworker.
 
 Keir Williams testified that he met Davis when he was working at a McDonald’s fast-food restaurant as a teenager and Davis was his supervisor. He said that he respected Davis and that Davis helped support Davis’s siblings.
 

 Teachers.
 
 Farrah Duncombe, who was the assistant principal at Carver High School when Davis was a student there, testified that Davis was a typical student and that he did not cause problems. Michelle Simmons, the athletic director at Carver High School, testified that she taught Davis. She said that Davis was a very cooperative student. On cross-examination she indicated that she had not seen Davis since he graduated from high school in 1991.
 

 The record shows that at the penalty phase counsel informed the court that funds had been granted for an independent mental evaluation of Davis and that the expert “could not ascertain any mental disease, mental defect, diminished capacity, that he found Mr. Davis to be intelligent, articulate, and that he did not think he could offer any testimony in this sentencing phase that would aid in perhaps supporting another statutory mitigation ground.” (R. 999.) Davis’s mother testified at the penalty phase that she had six sons, that Davis was the second oldest of her children, that Davis’s father died when he was 16, and that she loved her son and he loved her. In closing argument counsel argued that there was one statutory mitigating circumstance present — that Davis had no significant history of prior criminal activity. Counsel asked the jury to spare Davis’s life.
 

 When questioned about the penalty phase, Copeland stated:
 

 “[Postconviction counsel]: With regard to the mitigation and penalty phase, sir, what was your theory?
 

 “[Copeland]: Well, in terms of the penalty phase, we at first — we requested that Mr. Davis, we have an independent psychiatrist assess Mr. Davis. I had, and I mentioned this in the deposition, a theory that was I have to admit a bit speculative, perhaps even creative. I had a theory in which we would argue that Mr. Davis suffered from a sort of chronic post-traumatic stress syndrome based on having had a very difficult life; drugs, being surrounded by ■violence, things like that. I was going to — I did not think that would exactly result in— there was nothing to indicate that Mr. Davis was at the time — that an insanity defense would have been available to him at the time of the crime or for that matter during the trial. However, using that particular mental disorder, I was going to use it to supplement what our basic strategy was for the penalty phase, which was mercy as a mitigating factor.
 

 [[Image here]]
 

 “[Postconviction counsel]: Did you talk with anybody who could put together a social history of Mr. Davis?
 

 “[Copeland]: Again, I mean, certainly wanting to allow you to enumerate, but, again, the answer is, we talked to his mother. We talked to Mr. Davis.
 
 We kept asking Mr. Davis, you know, help us out, give us something, tell us somebody to talk to. He was unresponsive to
 
 us.”
 
 [10]
 

 
 *1141
 
 (R. 43^47) (emphasis added). On cross-examination, Copeland stated:
 

 “[Copeland]: All factors of mitigation are relevant to the extent that you can produce them for that person. For example, school records having to do with somebody’s performance in school might indeed be very valuable as a mitigating factor. If you are going to develop a long-range picture of depravity; for example, say if somebody was sexually abused as a child, clearly that would only apply to a particular defendant, so it wouldn’t be relevant, for example, to Mr. Davis’s case because there was no evidence that happened. That would be extremely relevant in the case of somebody who was standing trial for a capital murder who had been molested. It would obviously have a great deal of impact. The fact that a particular individual did well in school or didn’t do well in school in and of itself might or might not be of value. In Mr. Davis’s case, it was apparent because of the nature of the crime, and I say this, I suppose, because this was my thinking, it was apparent because of the nature of the crime which included killings of two people and an attempt to kill another, but one of them was a sort of execution style killing of a guy sleeping on a sofa, shot him in the head, as I recall, that what Mr. Davis had done in grade school might not have been of the greatest value.”
 

 (R. 57-59.)
 

 “As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias.”
 
 Bergmann v. McCaughtry,
 
 65 F.3d 1372, 1380 (7th Cir.1995).
 

 “Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are ‘virtually unchallengeable.’
 
 [Strickland v. Washington,
 
 466 U.S. 668] at 690, 104 S.Ct. 2052 [ (1984) ]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry ‘is not whether counsel should have presented a mitigation case’ but ‘whether the investigation supporting counsel’s decision not to introduce mitigating evidence ... was itself reasonable.’ See
 
 Wiggins [v. Smith],
 
 539 U.S. [510] at 523, 123 S.Ct. 2527 [(2003)] (internal citations omitted).”
 

 Powell v. Kelly,
 
 562 F.3d 656, 670 (4th Cir.2009). See also
 
 Villegas v. Quarterman,
 
 274 Fed.Appx. 378, 382 (5th Cir. 2008). Evidence of a difficult childhood has been characterized as a “double-edged” sword. See
 
 Bacon v. Lee,
 
 225 F.3d 470, 481 (4th Cir.2000). “[E]mphasizing a client’s deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct.”
 
 Card v. Dugger,
 
 911 F.2d 1494, 1511 (11th Cir.1990). What one juror finds to be mitigation another juror may find aggravating. “[Mitigation may be in the eye of the beholder.”
 
 Stanley v. Zant,
 
 697 F.2d 955, 969 (11th Cir.1983). See also
 
 Ford v. Schofield,
 
 488 F.Supp.2d 1258, 1346 (N.D.Ga.2007) (“The Supreme Court has stated that the reasonableness of counsel’s actions should be evaluated based on ‘strategic choices made by the defendant and on information sup
 
 *1142
 
 plied by the defendant.’
 
 Burger v. Kemp,
 
 483 U.S. 776, 796, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) ....”);
 
 Carroll v. State,
 
 815 So.2d 601, 616 (Fla.2002) (“By failing to respond to counsel’s requests to provide trial counsel with the names of witnesses who could assist in presenting mitigating evidence, Carroll may not now complain that trial counsel’s failure to pursue such mitigation was unreasonable.”);
 
 Rose v. State,
 
 617 So.2d 291, 295 (Fla.1993) (“In light of the harmful testimony that could have been adduced from Rose’s brother and the minimal probative value of the cousins’ testimony, we are convinced that the outcome would not have been different had their testimony been presented at the penalty phase.”).
 

 Copeland testified that he made a strategic decision to rely on a plea for mercy. It is clear from both attorneys’ testimony that they conducted an investigation and were aware of Davis’s background and upbringing. Copeland stated that he did not believe evidence of Davis’s performance in school would have had any value because of the nature of the murders. Based on the unique circumstances presented in this case we cannot say that counsel’s actions were unreasonable. Moreover, the testimony at the evidentiary hearing was neither strong nor compelling. Davis was over the age of 25 at the time of the murders. One of Davis’s brothers who testified at the postconviction proceedings was 14 years of age at the time of Davis’s trial. Another brother who testified was in prison at the time of Davis’s trial. Davis’s mother painted a different pictui*e of Davis’s childhood than did Davis’s siblings. Many witnesses admitted that they knew that Davis was selling drugs from his home in Gibbs Village. Other witnesses had not seen Davis for many years. The testimony offered at the postconviction hearing would have been entitled to little weight.
 

 Also, we have reweighed the omitted mitigation evidence against the aggravating circumstances that were proven in this case. The circuit court found as aggravating circumstances that the murders were committed during a burglary, that Davis was on parole for another offense at the time of the murders, and that the murders were committed to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws. See §§ 13A-5-49(l), (4), and (7), Ala.Code 1975. We agree with the circuit court that the testimony offered at the postconviction hearing was not sufficient to outweigh the aggravating circumstances that were present in this case. See
 
 Wiggins v. Smith,
 
 supra. Thus, relief was correctly denied on this claim.
 

 B.
 

 Davis further argues that his trial counsel were ineffective for failing to secure mental-health testimony in mitigation.
 

 When denying relief on this claim, the circuit court stated:
 

 “Copeland and Belser retained Dr. William Freeman, a psychiatrist, to evaluate Davis for possible mitigation evidence. Dr. Freeman was deposed by the parties on September 14, 2005. Freeman indicated he had been unable to locate most of his records concerning his evaluation of Davis and his memory of the evaluation was very vague. Freeman did recall finding some ‘childhood’ problems that might be worthwhile for mitigation. Freeman could not, however, recall what specific childhood problems he believed might have been presented in mitigation. At Davis’s evidentiary hearing, however, Copeland and Belser specifically testified that Freeman advised them against
 
 *1143
 
 calling him during the penalty phase of trial.
 

 “The Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced because Copeland and Belser did not con-, suit more with Freeman or call him during the penalty phase of his trial. Rule 32.2(c), Ala. R.Crim. P. Rule 32.7(d), Ala. R.Crim. P.
 
 See Brooks v. State,
 
 695 So.2d 176, 182 (Ala.Crim.App.1996) (holding that ‘[prejudice cannot merely be alleged; it must be affirmatively proved’).”
 

 (C.R. 883-84.)
 

 At the postconviction hearing, the State called Dr. Glen King, a clinical and forensic psychologist, as a rebuttal witness. Dr. King testified that he performed a mental evaluation of Davis which included conducting an IQ test. Davis scored a verbal IQ of 95, a performance IQ of 107, and full scale IQ of 100. It was also Dr. King’s opinion that Davis did not suffer from any significant psychological disorders and had never suffered from any serious psychological disorder.
 

 There was no evidence that Davis had any mental-health problems. Accordingly, counsel was not ineffective for failing to present testimony as to Davis’s mental health.
 

 III.
 

 Davis next argues that he was deprived of his right to due process when the State withheld exculpatory information in violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he asserts that the State failed to disclose that Eugene Smith was unable to identify Davis until after he testified and that there were potential alibi witnesses.
 

 The circuit court stated the following concerning this claim:
 

 “Davis contends the State did not inform him or his trial counsel before trial about Eugene Smith’s inability to remember picking Davis out of a photo line up. Davis was made aware during his trial of Smith’s actions during the photo line-up. The Court finds this allegation is precluded from postconviction review because it could have been but was not raised on direct appeal. See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P. Therefore, this allegation is summarily dismissed.”
 

 (C.R. 802.)
 

 In
 
 Payne v. State,
 
 791 So.2d 383 (Ala.Crim.App.1999), we stated:
 

 “Because this
 
 Brady
 
 claim was first presented in a Rule 32 petition, Payne can obtain relief only if it involves ‘newly discovered evidence.’ Newly discovered evidence is defined under Rule 32.1, Ala. R.Crim.P., as follows:
 

 “ ‘Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
 

 [[Image here]]
 

 “ ‘(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
 

 “ ‘(1) The facts relied upon were not known by petitioner or petitioner’s counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, [Ala. R.Crim. P.,] or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
 

 
 *1144
 
 “ ‘(2) The facts are not merely cumulative to other facts that were known;
 

 “ ‘(3) The facts do not merely amount to impeachment evidence;
 

 “ ‘(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
 

 “‘(5) The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received.’
 

 “Rule 32.1(e), Ala. R.Crim. P. We note that because of the conjunctive ‘and’ between (4) and (5), Payne must meet all five prerequisites of Rule 32.1(e), Ala. R.Crim. P., in order to prevail. Cf.
 
 Brown v. State,
 
 [807 So.2d 1 (Ala.Crim.App.1999) ].”
 

 791 So.2d at 397. Davis failed to plead and to prove the requirements for newly discovered evidence. Thus, this claim was barred in this Rule 32 proceeding.
 

 Furthermore, Davis did not allege in his Rule 32 petition that the State failed to disclose the identities of potential “alibi” witnesses. Thus, this issue is not properly before this Court. “An appellant cannot raise an issue from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.”
 
 Arrington v. State,
 
 716 So.2d 237, 239 (Ala.Crim.App.1997).
 

 IV.
 

 Davis next argues that the circuit court erred in adopting verbatim the State’s proposed order denying the Rule 32 petition.
 

 As we stated in
 
 Hyde v. State,
 
 950 So.2d 344 (Ala.Crim.App.2006):
 

 “Hyde contends that the circuit court erred in adopting the State’s proposed order. Specifically, he argues that there are numerous factual and legal errors in the order that indicate that the order does not represent the court’s own independent judgment, but shows a wholesale adoption of the State’s proposed order without consideration of his claims. However, this Court has repeatedly upheld the practice of adopting the State’s proposed order when denying a Rule 32 petition for postconviction relief. See, e.g.,
 
 Coral v. State,
 
 900 So.2d 1274, 1288 (Ala.Crim.App.2004), overruled on other grounds,
 
 Ex parte Jenkins,
 
 [972 So.2d 159] (Ala.2005), and the cases cited therein. ‘Alabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.’
 
 McGahee v. State,
 
 885 So.2d 191, 229-30 (Ala.Crim.App.2003).”
 

 950 So.2d at 371. See also
 
 McNabb v. State,
 
 991 So.2d 313 (Ala.Crim.App.2007);
 
 Waldrop v. State,
 
 987 So.2d 1186 (Ala.Crim.App.2007);
 
 Madison v. State,
 
 999 So.2d 561 (Ala.Crim.App.2006);
 
 Hunt v. State,
 
 940 So.2d 1041 (Ala.Crim.App.2005).
 

 Based on the reasons stated above, we conclude that the circuit court’s findings were not clearly erroneous; thus, there is no reversible error. Accordingly, we affirm the circuit court’s denial of Davis’s Rule 32 petition.
 

 AFFIRMED.
 

 WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.
 

 [1]
 

 . Davis filed his petition after the Alabama Supreme Court amended Rule 32.2(c), Ala. R.Crim. P., to shorten the limitations period from two years to one year.
 

 [2]
 

 . Singleton was convicted of capital murder, attempted murder, and conspiracy to commit murder for his role in the events that occurred on November 29, 1996. He was sentenced to life imprisonment without the possibility of parole. We affirmed his conviction and sentence by unpublished memorandum.
 
 Singleton v. State
 
 (CR-98-2198, September 22, 2000) 814 So.2d 1011 (Ala.Crim.App.2000) (table).
 

 [3]
 

 . Jointer testified at Davis’s trial. He was convicted of conspiracy to commit murder and was sentenced to 10 years.
 

 [4]
 

 . Issues raised in Davis’s Rule 32 petition but not argued on appeal are deemed abandoned.
 
 See Hyde v. State,
 
 950 So.2d 344, 358 (Ala.Crim.App.2006).
 

 [5]
 

 . Davis raises no claims of ineffective assistance of appellate counsel in his brief. See Rule 28(a)(10), Ala. R.App. P.
 

 [6]
 

 . No issue in Davis's Rule 32 petition specifically referenced “alibi” witnesses; however, Walker and Clayton were named in the petition.
 

 [7]
 

 . “An alibi ‘to be successful must cover the entire time when [appellant’s] presence was required for accomplishment of the crime... .[A] purported alibi that leaves it possible for the accused to be the guilty person is no alibi at all.’ ”
 
 State v. Goodroad,
 
 521 N.W.2d 433, 440 (S.D. 1994), quoting
 
 State v. Floody,
 
 481 N.W.2d 242, 248 (S.D.1992).
 

 [8]
 

 . This Court may take judicial notice of our previous records. See
 
 Nettles v. State,
 
 731 So.2d 626 (Ala.Crim.App.1998).
 

 [9]
 

 . "Federal habeas corpus actions filed under 28 U.S.C. § 2254 are similar to our Rule 32 proceedings.”
 
 Jackson v. State,
 
 910 So.2d 797, 803 n. 2 (Ala.Crim.App.2005).
 

 [10]
 

 . "The reasonableness of counsel’s investigation and preparation depends critically on the
 
 *1141
 
 information supplied by the defendant.”
 
 Commonwealth v. Uderra,
 
 550 Pa. 389, 401, 706 A.2d 334, 340 (1998).